James W. DAVIS and Linda J. Davis, Appellants

v.

FISCHER SINGLE FAMILY HOMES, LTD.; FSFH, Inc.; Dan Messer's Masonry; and D & P Masonry, LLC, Appellees.

Fischer Single Family Homes and FSFH, Inc., Cross–Appellants

v.

James W. Davis and Linda J. Davis, Cross–Appellees

Dan Messer's Masonry and D & P Masonry, LLC, Cross–Appellants

v.

James W. Davis and Linda J. Davis, Cross–Appellees.

Nos. 2006–CA–000005–MR, 2006–CA–000038–MR, 2006–CA–000074–MR.

Court of Appeals of Kentucky.

Aug. 10, 2007.

768

Joseph E. Conley, Jr., Crestview Hills, KY, for Appellants/Cross–Appellees.

David A. Futscher, Covington, KY, for Appellee/Cross–Appellant Fischer Single Family Homes.

Otto Daniel Wolff, Edgewood, KY, for Appellee/Cross–Appellant Dan Messer Masonry.

Before ABRAMSON and NICKELL, Judges; KNOPF,[1] Senior Judge.

## OPINION

NICKELL, Judge.

James and Linda Davis (hereinafter referred to as "Davis") have appealed from a jury verdict finding no liability against Fischer Single Family Homes, LTD, FSFH, Inc. (hereinafter collectively referred to as "Fischer"), Dan Messer's Masonry, and D & P Masonry, LLC (hereinafter collectively referred to as "Messer"). Fischer and Messer have each cross-appealed from the same verdict. We affirm.

In January 2001, Davis contracted with Fischer to construct a house in Hebron, Kenton County, Kentucky. Messer was sub-contracted to perform the brick work

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

on the exterior of the home. Construction was completed in July 2001 and Davis took possession of the home in early August 2001. Included in the contract was a one-year warranty providing for the correction of any construction defects found within that period. Davis timely submitted a list of known defects on July 3, 2002, and Fischer completed the required repairs. During the completion of these repairs in September 2002 Davis informed Fischer of previously unreported damp areas in the living and dining rooms. Fischer investigated the damp areas and was able to quickly resolve the leak which caused the dining room problem. Investigation continued into the source of the living room leak. Davis reported he had contracted to have a mold assessment performed on the residence, but at that time was unable to produce the results of this testing.

In accordance with its corporate policy, Fischer offered to provide Davis with alternate housing while a professional mold assessment was performed and during the period of any remediation work revealed to be necessary. Davis did not desire to vacate the residence as no mold-related health symptoms had been experienced. Fischer employed a certified industrial hygienist to inspect the property for evidence of any mold infestation. During the hygienist's visit, Davis reported a new leak in the basement of the home. Fischer determined the source of this leak was a breakdown of a piece of flashing which could be and was easily repaired. Fischer was still unable to determine the source of the living room leak.

Fischer proposed to cut a series of holes in the interior walls of the living room in order to effectively determine the source of the water intrusion. Davis demanded a mold test be performed of the wall cavity prior to cutting through the drywall. Davis informed Fischer he was well experienced with such testing as he worked for his son's environmental remediation company. Fischer agreed to employ Davis' son to perform the testing. On October 14, 2002, the requested testing was performed which revealed no signs of mold growth within the walls. The following day, Davis revealed the results of his prior mold testing completed on August 28, 2002, which revealed similar results.

On October 21, 2002, Fischer's construction manager visited the residence and was able to determine the living room leak was the result of a breakdown in the caulking surrounding a second floor window located directly above the living room. Fischer then informed Davis of its findings along with a proposed remediation plan for the existing leak and preventive work on the remainder of the home. Davis declined Fischer's plan and demanded the entire brick facade be removed and replaced. For the first time, Davis then reported adverse health effects from exposure to mold within the home, reciting a long list of alleged symptoms. Davis further revealed his intentions to have additional mold testing performed and to vacate the residence. Nevertheless, Fischer continued its attempts to resolve the issues with the Davis residence and again offered to pay for alternative housing arrangements with a per diem stipend while the remediation work was being performed. While Fischer believed there was no mold contamination within the home, it extended the offer out of an abundance of caution.

Fischer hired two additional companies to evaluate the home and write remediation plans. Davis rejected each of these and refused to allow Fischer to perform any further work on the residence unless Fischer would agree to remove and replace the entire brick facade. When Fischer refused, Davis filed suit on March 14, 2003, in Kenton Circuit Court alleging

various personal injuries related to mold exposure. Subsequently, Davis expanded his allegations to include multiple construction defects, fraud, and negligence, ultimately amending his complaint nine months later to include Messer as a co-defendant.

An eight day jury trial occurred in November 2005 wherein all parties and numerous experts presented testimony. After deliberations, the jury returned a verdict in favor of the defendants, allocating 100% fault to Davis. This appeal followed.

Davis contends the trial court erred in (1) allowing each defendant separate sets of peremptory challenges, (2) refusing to permit examination of a defense witness on alternative construction techniques, (3) admitting a letter from the Kentucky Department of Housing, (4) admitting evidence of industry standards which directly contravened a legislative enactment, (5) excluding evidence of similar problems in other Fischer-built homes, (6) refusing to permit a chief medical witness to testify live after having previously testified on videotape, (7) excluding testimony of the future health effects from mold exposure, and (8) excluding a variety of items regarding Davis' damages. Fischer and Messer have each cross-appealed alleging error in the jury instructions. We shall examine each claim of error separately.

## I. PEREMPTORY CHALLENGES

■ Davis first contends the trial court erroneously granted Fischer and Messer separate sets of peremptory challenges, thus affecting the fundamental fairness of the trial. We disagree. In general, each opposing side of a controversy is granted three peremptory challenges to the jury panel. However, Kentucky Rules of Civil Procedure (CR) 47.03(1) provides "co-parties having antagonistic interests shall have three peremptory challenges each." Davis contends Fischer and Messer were not, in fact, antagonistic to one another. After a careful review of the record, we hold they were antagonistic.

■ Absent an abuse of discretion, we will not substitute our judgment for the determination of the trial court that the parties had antagonistic interests. *Sommerkamp v. Linton,* 114 S.W.3d 811 (Ky. 2003). Further, if the findings of fact are not clearly erroneous or the opposite result is not compelled by the facts before the trial court, the decision of the trial court will not be disturbed, even if we would have come to a different conclusion. In *Sommerkamp,* the Supreme Court of Kentucky set out the framework for making the decision as to whether antagonistic interests exist.

Generally there are three elements to be considered in determining if coparties have antagonistic interests. They are 1) whether the coparties are charged with separate acts of negligence[;] 2) whether they share a common theory of the case[;] and 3) whether they have filed cross-claims. Additional important factors are whether the defendants are represented by separate counsel; whether the alleged acts of negligence occurred at different times; whether the defendants have individual theories of defense; and whether fault will be subject to apportionment. All of these factors are to be weighed by the trial court in determining if the defendants have antagonistic interests and thus are entitled to separate peremptory challenges (internal citations omitted).

*Id.* at 815. Due weight shall be given to each of these factors as the existence or absence of a single factor is insufficient to make a determination as to the reasonableness of the trial court's ruling. Each factor must be weighed in the balance with

the others. *See Davenport v. Ephraim McDowell Mem'l Hosp. Inc.*, 769 S.W.2d 56 (Ky.App.1988).

■ Davis has not provided any specific references to the record justifying his demand for reversal, but merely a general objection regarding the common defense strategies employed by Fischer and Messer during the trial. However, a trial court's ruling under CR 47.03 must necessarily be made prior to trial and subsequent trial strategy is irrelevant to our review. *See Bayless v. Boyer*, 180 S.W.3d 439, 448 (Ky.2005). While it is true no cross-claims were filed in the instant action and the defendants engaged in joint defense efforts, those factors cannot be viewed in isolation from the other elements regarding antagonistic interests. *See Roberts v. Taylor*, 339 S.W.2d 653 (Ky.1960) (holding the filing of cross-claims is not required to establish the right to additional peremptory challenges when the parties hold antagonistic interests in fact); *Sommerkamp, supra.*

In the case *sub judice*, Davis first filed suit against Fischer with no mention of Messer. Some nine months later, Messer was added as a defendant to the action by amended complaint which clearly charged Fischer and Messer with separate acts of negligence, which negligence was alleged to have occurred at differing times throughout the construction of the Davis residence. Therefore, Davis' own complaint revealed a great likelihood of antagonism between the two defendants.[2]

Further, Fischer and Messer were represented by separate, independent counsel throughout the litigation. Each defendant practiced the case much differently from the other, a fact noted by the trial court.[3] While Fischer and Messer presented a unified front of defense, their strategies were quite different.

■ Finally, before trial an apportionment instruction had been tendered to the trial court. "Inherent in the Kentucky law of apportionment, KRS 411.182, is that the interests of codefendants may be considered antagonistic." *Sommerkamp*, 114 S.W.3d at 816. As Fischer and Messer were charged with separate and independent acts of negligence, each would be able to escape or reduce its liability by convincing the finder of fact that the other was responsible for the alleged damages. Thus, the system of apportionment is inherently antagonistic. We cannot say the trial court abused its discretion in granting separate peremptory challenges to Fischer and Messer.

## II.   ALTERNATIVE CONSTRUCTION TECHNIQUES

■ Davis next contends the trial court erred in refusing to permit the examination of Messer's expert witness, Gary Wahoff (hereinafter "Wahoff"), regarding alternative techniques of applying brick and mortar. The trial court based its denial of such examination on the proscription set forth in Kentucky Rules of Evidence

---

**2.**  Davis argues Fischer and Messer were not charged with separate acts of negligence. However, even the most cursory review of the amended complaint reveals significant differences in the allegedly negligent acts imputed to each defendant. Fischer was charged with no less than five counts at varying degrees and types of negligence, none of which referred to the work performed by Messer. Messer was charged in only one count of negligently applying the brick facade to the

residence, with no references to the work performed by Fischer. No nexus between the acts of the parties was provided which would imply a joint connection to Davis' alleged damages.

**3.**  Contrary to Davis' contention, Fischer and Messer filed several separate pretrial motions and requests for relief.

(KRE) 407 regarding subsequent remedial measures. As this is a question regarding an evidentiary matter, our standard of review is limited to a determination as to whether the trial court abused its discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky.2000).

KRE 407 states as follows:

When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, *if controverted*, or impeachment (emphasis added).

The technique about which Davis intended to question Wahoff was one implemented by Messer subsequent to the construction of the Davis residence intended to reduce the amount of mortar which collected behind the brick veneer. Davis contends Wahoff's testimony *during direct examination* opened the door to questions regarding alternative techniques. However, our review of the record reveals no such testimony. Wahoff testified only as to the general techniques and mechanics of brick masonry. Further, he confirmed it was a normal occurrence to find some mortar squeezed out behind the layers of brick. He offered no testimony regarding any techniques to minimize the amount of such "squeeze-out" nor the feasibility of applying any such remedial measures. We can find no way in which this testimony could be viewed as opening the door to the examination requested by Davis.

■ Alternatively, Davis contends he intended to elicit the testimony based upon the feasibility exception of KRE 407. However, Davis presented no evidence to controvert any of Wahoff's testimony. Pursuant to the plain language of the rule, in the absence of controversy, the feasibility exception of KRE 407 simply does not apply. Therefore, the trial court did not abuse its discretion in disallowing the requested examination of Wahoff.

### III.  OPINION LETTER

■ Davis next contends the trial court erred in admitting a letter from an employee of the Kentucky Environmental and Public Protection Cabinet, Office of Housing, Buildings and Construction (hereinafter "OHBC") [4] concerning the acceptability of a smaller gauge [5] of wall ties [6] than was required by the building code in effect at the time of the construction at issue herein. Davis alleges the letter constituted inadmissible hearsay under KRE 802. We disagree.

During cross-examination of Davis's building code and structural engineering

---

4.  OHBC is the state agency responsible for promulgating state building codes and for the administration of standards relating to the construction of buildings.

5.  The parties use the spelling "gage" which is used in the building code, rather than the more common spelling "gauge" to refer to the size of the wall ties. As these spellings are interchangeable, for purposes of this opinion we shall adopt the more common spelling.

6.  Wall ties are pieces of steel which are used to anchor brick veneer to the supporting wall of the structure. The code in effect at the time of construction of the Davis residence called for the use of 22 gauge wall ties, but Fischer provided Messer with 28 gauge wall ties for use in the Davis residence.

experts, Fischer referenced an opinion letter from OHBC addressed to the Home Builders Association of Kentucky which stated the use of the smaller gauge wall ties was an acceptable alternative under the applicable building code. The letter was not read to the jury, was not published to the jury, and was never admitted into evidence.

The general rule is that hearsay is not admissible. KRE 802. However, Fischer's reference to the letter in issue does not meet the definition of hearsay. KRE 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In the case *sub judice,* the letter was not offered into evidence, nor was it offered to prove the truth of the matters asserted therein. The letter was referenced only in an effort to impeach the credibility of Davis's experts and their expressed opinions. More particularly, Fischer referenced the OHBC letter merely to ascertain the experts' awareness of its existence and whether they had considered it in reaching their conclusions or forming their opinions. Therefore, pursuant to the plain language of the rule, the letter cannot be construed as hearsay, and the trial court did not err in allowing Fischer to utilize it during cross-examination.

■ Even were we to determine, *arguendo,* that Fischer's reference to the OHBC opinion letter constituted inadmissible hearsay, any error in its admission would be insufficient to entitle Davis to the relief he seeks. The substantial rights of the parties were not affected by reference to the letter during examination of the witnesses or during closing arguments. Further, denial of the relief requested will not result in a violation of the interests of substantial justice. We are unable to conclude the outcome of the trial would have been any different had reference to the letter been excluded. Therefore, any alleged error would be harmless at best. *See* CR 61.01.

■ Davis next argues Fischer sought the opinion letter from OHBC in order to defeat any claims of liability based on the use of the smaller gauge wall ties. However, nothing in the record indicates Fischer or Messer had any involvement in the procurement of the advisory opinion. The letter was not addressed to any of the parties to this litigation, nor was the Davis residence referenced in the letter. Further, Davis is unable to provide any reference to the record indicating the opinion letter was untrustworthy. Therefore, this argument is without merit.

## IV. INDUSTRY STANDARDS

■ Davis next contends the trial court erred in admitting evidence of the industry standards regarding the use of smaller gauge wall ties in contravention of the plain language of the building code. Davis claims admission of this testimony allowed the jury to nullify a legislative pronouncement regarding the applicable standard of care. This argument is without merit.

■ It is true that "building code violations, if proven, constitute negligence *per se* . . . ." *Real Estate Marketing, Inc. v. Franz,* 885 S.W.2d 921, 927 (Ky.1994). However, "there can be no recovery unless the negligence was the proximate or contributing cause of an accident." *Louisville Taxicab & Transfer Co. v. Holsclaw Transfer Co.,* 344 S.W.2d 828, 829 (Ky. 1961).

■ In the case at bar, conflicting evidence was presented to the jury as to whether Fischer and Messer had, in fact, violated the building code by using smaller

wall ties. While the code specifically required the use of the larger gauge wall ties, it also specifically allows for the use of alternative materials and methods which substantially comply with the spirit of the code. Experts for both Davis and Fischer agreed that the smaller gauge ties would be an acceptable alternative under the code. Thus, it was up to the jury to weigh the evidence in order to determine whether there had, in fact, been a violation of the building code. A review of the jury's verdict reveals it did not so find and we will not disturb that finding as there was sufficient evidence upon which the jury could have reasonably based its decision. *Commonwealth Department of Highways v. Stocker*, 423 S.W.2d 510, 515 (Ky.1968) (a verdict based upon substantive evidence of probative value must be upheld even if the reviewing court would have come to a different result). Further, even if the jury were to have found a building code violation had occurred, Davis failed to produce any evidence that such violation was the proximate or contributing cause of the water intrusion into the structure. In the absence of such proof, Davis is entitled to no recovery for the building code violation. *See Louisville Taxicab, supra.*

## V. EVIDENCE OF SIMILAR PROBLEMS

Davis's fifth allegation of error centers upon the trial court's failure to allow him to present evidence regarding defective brick work in other Fischer-built homes in the same neighborhood as the Davis residence. This argument is also without merit.

■ It has long been held that evidence of prior negligent acts or customary practices, offered solely in an attempt to prove negligence on a different occasion, is inadmissible as it offers very little probative value and presents a potential for confusion of the issues. *See Dowell v. Bivins*, 586 S.W.2d 297 (Ky.App.1979); *Moore v. Bothe*, 479 S.W.2d 634 (Ky.1972); and *Kentucky–West Virginia Gas Co. v. Slone*, 238 S.W.2d 476 (Ky.1951). Any testimony regarding other homes in the neighborhood which had been built by Fischer or Messer would have no bearing on the facts in issue in the instant litigation. Therefore, the trial court correctly excluded the evidence on the basis of relevancy.

Further, Davis' contention that Fischer opened the door to such questioning is without merit. Davis fails to point to any specific place in the record supportive of his argument, and our review of the record indicates no such support exists. Thus, the trial court correctly rejected Davis's request to question Fischer's experts regarding similar problems in other homes.

## VI. REFUSAL TO ALLOW LIVE TESTIMONY

■ Davis next contends the trial court erred in requiring the testimony of his chief medical expert, Dr. Jonathan Bernstein (hereinafter "Bernstein"), to be presented by videotape and refusing to allow Bernstein to testify live before the jury. We disagree. Again, as this is a ruling upon an evidentiary matter, our review is limited to a determination of whether the trial court's ruling constituted an abuse of discretion. *Goodyear Tire and Rubber, supra.*

Davis and Bernstein initially took advantage of CR 32.01(c) which allows practicing physicians the privilege of testifying via deposition rather than having to personally appear at the trial. Davis served notice of this intent and Bernstein was deposed as if testifying at trial, including direct, cross, and redirect examination. Bernstein's deposition was videotaped for use at trial. Subsequent to this deposition, Davis se-

cured a continuance of the scheduled trial date and proceeded to have Bernstein prepare a supplemental report to address weaknesses revealed during his deposition. Fischer sought an order to limit the testimony of all deposed witnesses to that which had been provided during their respective depositions. The trial court entered such order on May 5, 2005, and later extended the restrictions by order entered June 29, 2005, limiting medical expert testimony to that produced prior to the aforementioned continuance.

After obtaining new counsel, Davis asked the trial court to allow previously deposed witnesses to give live testimony at trial. The trial court overruled this motion. Davis now argues this was error as courts from other jurisdictions have expressed a preference for live testimony over other technological presentations. Davis cites no Kentucky authorities supportive of his contention, and we have found no such preference in opinions from courts within the Commonwealth. While there is foreign authority for this proposition, they are not binding on this Court. Further, based on the facts before us on this appeal, we decline to announce any preference for live testimony. Even if a preference for live testimony was suggested by binding precedent, it is within the considerable discretion of the trial court to determine the admissibility evidence and how such evidence is presented. *See Baker v. Kammerer*, 187 S.W.3d 292, 294 (Ky. 2006) (acknowledging general rule that trial judge has discretion as to the "presentation of evidence as well as the scope and duration of cross-examination" (citations omitted)); and *Estep v. Commonwealth*, 957 S.W.2d 191 (Ky.1997).

Here, the trial court sought to "lock in" the testimony of the experts and other witnesses so as to prevent any party from gaining an unfair advantage due to the numerous continuances which had been granted in this litigation. The trial court was aware that Davis had previously utilized continuances in this case in order to supplement his experts' testimony once weaknesses were revealed during their cross-examination depositions. The trial court thus limited Dr. Bernstein's testimony[7] to that of his videotaped deposition for reasons of fundamental fairness and judicial economy. Under the facts and circumstances presented to the trial court in this case, we find no abuse of discretion in the trial court's ruling.

Further, Davis' contention that he was prejudiced by the inability to have live testimony at trial is severely undercut by the fact that Bernstein's testimony was presented via videotape. The jury was able to observe Bernstein during direct and cross-examination and to assess his credibility firsthand. This is substantially different than having testimony from a deposition read to the jury by a third party. Davis made the initial choice to have Bernstein testify via videotaped deposition and cannot now be heard to complain for being held to such choice. *See Trevillian v. Boswell*, 241 Ky. 237, 43 S.W.2d 715, 718 (Ky.1931) (collecting cases) ("The client is responsible for his counsel's conduct for whatever may be done by him in the pursuit of his cause or defense, in the conduct of the trial, in the interrogation of the witnesses, and in the argument of the case.").

## VII. FUTURE HEALTH EFFECTS

Davis next contends the trial court erred in excluding Bernstein's testi-

---

**7.** While the issue raised in this appeal is limited to Dr. Bernstein's testimony, we note the trial court limited all expert testimony to that provided during their respective videotaped depositions.

mony regarding the future health effects of mold exposure. We disagree. After conducting a hearing as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the trial court excluded the proffered testimony. On appeal, a trial court's decision on the admissibility of expert witness testimony is generally entitled to deference as the trial court is in the best position to judge the credibility of the evidence presented. *Miller v. Eldridge*, 146 S.W.3d 909 (Ky.2004). As previously stated, we review such findings for an abuse of discretion. *Goodyear Tire and Rubber, supra.*

█ The central question surrounding the admissibility of expert testimony is "an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S at 592, 113 S.Ct. at 2796. Bernstein was the only witness to testify at the hearing. He testified as to the short-term and long-term permanent health effects of exposure to mold. His testimony at the *Daubert* hearing included an admission that current scientific testing practices have significant limitations in establishing a causal link between mold exposure and health effects. He was unable to identify substantial scientific or medical data or testing which corroborated his diagnosis or testimony related to long-term permanent health effects. Further, Bernstein was unable to conclusively rule out other medical possibilities and explanations for Davis' reported symptoms.[8] Thus, the trial court concluded such testimony was unreliable

and should be excluded from presentation to the jury. However, the trial court did rule that it would allow Bernstein's testimony as to the short-term health effects of mold exposure after finding that portion of the testimony to be scientifically valid and pertinent to the facts in issue. Having reviewed the pertinent portions of the record, we are unable to conclude the trial court abused its discretion.

## VIII. EVIDENCE OF COLLATERAL DAMAGES

Finally, Davis contends the trial court erred in excluding evidence of "a number of items of damages" which allegedly flowed directly from the negligent acts charged against Fischer and Messer. These damages included the cost to purchase a motor home, the cost to purchase a second residence including duplicative tax and utility payments on such residence, the cost of purchasing furnishings for the second residence, proof of stigma damages associated with mold contamination, and proof of emotional distress and depression. While the trial court's ruling on this issue appears to deal exclusively with evidentiary matters, in actual fact this is a question of law. The trial court excluded the evidence only after making a determination as a matter of law that Davis was not entitled to recovery for these damages. "Our review of a question of law is *de novo* as contrasted with the deferential standard to which we are held as to questions of fact." *New v. Commonwealth*, 156 S.W.3d 769, 774 (Ky.App.2005) (citing *Faust v. Commonwealth of Kentucky, Tourism Development Cabinet, Department of Parks*, 142 S.W.3d 89, 96 (Ky.2004)).

---

**8.** We note Bernstein did not make his diagnosis of irritant-induced asthma until approximately one year *after* Davis vacated the residence, and was unable to conclusively state the cause of the asthma was mold-related. Furthermore, Bernstein was unaware Davis had reported being asthmatic to another physician approximately one year *prior* to moving *into* the residence.

■ After hearing the arguments of counsel, the trial court ruled Davis would be allowed to offer evidence related to damages sustained within a "reasonable time" following the discovery of the alleged mold contamination. In order to define this time period, the trial court relied upon testimony from Davis' own remediation expert that the residence could be repaired and returned to a safe state for habitation within a period of two months. Thus, the trial court ruled Davis could, at most, be potentially entitled to damages incurred only within that two month time period. However, Davis wished to produce testimony regarding the motor home purchased seven months after the initial discovery of mold, as well as the purchase and associated costs of the second home which occurred approximately two and one-half years later. The trial court ruled these expenses were not incurred within a reasonable time and excluded any testimony regarding same. We hold the trial court did not err in this ruling.

■ Davis was unable to provide evidence that the excluded damages were incurred as a natural consequence of the negligent actions of Fischer or Messer. Fischer had offered to pay for alternative living arrangements while remediation work was performed on the Davis residence. Further, Fischer had offered Davis a per diem stipend while such work was being performed. Both of these offers were categorically refused by Davis. Thus, Davis could not thereafter complain that alternative living expenses incurred during the period of disagreement should be the responsibility of Fischer or Messer. This is especially true in light of the fact that the disagreement continued for an extended period prior to the filing of the instant action, and that the litigation below continued for a period in excess of two years. To hold Fischer or Messer respon-

sible for such expenses would lead to an absurd state of the law, one in which a party allegedly wronged by another could increase the damages due him by merely extending the period of disagreement and subsequent litigation. It is well-settled in this Commonwealth that a party must mitigate his damages. *See Howard v. Adams*, 246 S.W.2d 1002 (Ky.1952) (an award of damages for loss of use must be based on a reasonable time to effectuate repairs and unnecessary delay by owner before undertaking repairs or time consumed in negotiations for settlement cannot be considered as a part of such reasonable time). Davis failed to so mitigate and the trial court correctly refused to allow evidence regarding such exaggerated damages.

■ Next, we hold the trial court properly denied Davis's request to introduce evidence regarding stigma damages associated with ownership of a residence contaminated with mold. First, Davis failed to provide any reliable evidence as to the appropriate amount of such damages. The only testimony offered was by avowal of a real estate appraiser who admitted any testimony he could offer on the subject would be speculative at best. Such speculative testimony is insufficient to be presented to a jury. Further, Kentucky law does not allow for recovery for damages to the reputation of real estate. *See Morgan v. Hightower's Adm'r*, 291 Ky. 58, 163 S.W.2d 21, 22 (Ky.1942). Finally, in direct contravention of an order of the trial court, Davis himself placed large signs in or on the home declaring it to be contaminated with mold due to construction defects. By doing so, Davis's own intentional actions severely exacerbated the very stigma for which he now seeks damages. Therefore, we hold the trial court did not err in excluding evidence regarding stigma damages as a party should not be rewarded for such insidious actions.

Davis's final contention regarding the exclusion of damage evidence relates to emotional distress and depression allegedly resulting from the mold contamination. However, Davis fails to note that his own treating psychiatrist refused to testify on his behalf. Such refusal to testify effectively eliminated all reliable evidence regarding Davis's alleged psychological or psychiatric diagnoses, which ultimately resulted in Davis withdrawing his claim for mental and/or psychological injuries and damages. The trial court did allow Davis to testify as to his own mental state, and as to how his relationships and behavior had been affected. Furthermore, the trial court permitted an instruction on mental suffering resulting from the exposure to mold while occupying the residence. Based on these facts, we are unable to hold the trial court committed error.

Having held all of Davis's claims of error to be without merit, we hold the cross-claims of Fischer and Messer regarding supposed errors in the jury instructions as to damages to the real property are therefore moot and require no further discussion. Therefore, for the foregoing reasons, the trial order and judgment of the Kenton Circuit Court is affirmed.

KNOPF, Senior Judge, concurs.

ABRAMSON, Judge, concurs and files separate opinion.

ABRAMSON, Judge, concurring.

I concur with the disposition of the issues raised on appeal. I write separately to clarify that my concurrence regarding the Opinion Letter is based on harmless error analysis. As we note, there was never any evidence that the gauge of the brick ties contributed in any way to the water intrusion. Consequently, there was no harm in the use of the Opinion Letter to cross-examine the Davises' expert on an irrelevant issue which had no effect on the substantial rights of the parties.