RENDERED:  SEPTEMBER 4, 2020; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-001777-MR

JORDAN CURTIS                                                            APPELLANT


v.
APPEAL FROM SIMPSON CIRCUIT COURT
HONORABLE JANET J. CROCKER, JUDGE
ACTION NO. 17-CI-00049


PRICE HOLDINGS, INC. d/b/a
FRANKLIN DRIVE-IN                                                        APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, COMBS, AND MAZE, JUDGES.

ACREE, JUDGE:  The Simpson Circuit Court entered a final judgment upon jury

verdict in favor of appellee, Price Holdings, Inc. d/b/a Franklin Drive-In (Price).

Appellant, Jordan Curtis, brings this appeal claiming the circuit court erred by

excluding evidence of subsequent remedial measures and by failing to give a

missing evidence instruction.  After careful review, we affirm.

## BACKGROUND AND PROCEDURAL HISTORY

Shortly before October 2016, Price bought 80 tons of asphalt to repave areas near the concession stand at the Franklin Drive-In outdoor theater. (Gary Price Depo., pp. 12-15). The events giving rise to this action occurred before that delivery and repaving could happen.

On October 1, 2016, Curtis was attending the drive-in with family and friends. Near the end of the first movie, Curtis's three-year-old daughter needed to use the bathroom at the concession stand. Curtis carried her to and from the restroom. On her return, Curtis fell.[1] She sustained a distal fibial fracture requiring surgery and was taken away by ambulance. Gary Price, co-owner of Price Holdings, was operating the drive-in that night, though he did not see the fall or learn that night the specific location of the fall.

A few days later, Curtis sent Price a Facebook message, seeking his insurance information. Price provided the information, informed his insurer of the accident and, at the insurer's request, took several photographs of the "general area" where Curtis fell.[2] Curtis's attorney or her attorney's representative also visited the drive-in and took photos of the "general area" of the accident.

---

[1] The concession/restroom is located on asphalt. Adjacent to this asphalt area is a gravel area, where the Curtis vehicle was parked. It is not refuted that she fell in the vicinity where asphalt meets gravel.

[2] One of the evidentiary obstacles that had to be maneuvered was avoidance of disclosure that the photos were taken for insurance purposes. *Finch v. Conley*, 422 S.W.2d 128, 130 (Ky. 1967)

On October 12, Curtis's attorney sent Price a spoliation letter, stating:

> In order to represent Jordan Curtis to the best of our ability, we must secure all potential evidence. At this time, we would like to request you to secure the video footage involved in this incident and make it available for our expert to inspect.[3] Please contact our office to make arrangements for this inspection.
>
> Do not alter the evidence in any way until we have had an opportunity to do our inspection. Failure to comply would be considered spoliation of evidence and could result in penalties assigned by the court.
>
> If your insurance company has possession of the evidence, please forward a copy of this letter to them immediately. We will deal with them directly.

(Record (R.) at 116).

The 80 tons of asphalt were delivered in early November and the area around the concession stand was paved, including where Curtis fell.

Curtis filed a tort action against Price alleging negligence and premises liability. Soon, Curtis filed a motion for summary judgment as to Price's liability or, in the alternative, for a missing evidence instruction on the basis that Price destroyed evidence of the uneven or broken asphalt. The circuit court denied

---

("[R]eference to . . . insurance . . . except in the absence of a clear showing of non-prejudice, will constitute a reversible error." (Citation and internal quotation marks omitted)).

[3] Price acknowledged that he received the letter, but the video footage automatically had been recorded over several days before the spoliation letter was written.

summary judgment and reserved ruling on a missing evidence instruction pending presentation of evidence.

However, the court granted Price's motion to exclude evidence of the subsequent remedial measure but did so only provisionally. The circuit court's order stated, in pertinent part, as follows:

> [E]vidence of Price's subsequent remedial measures is inadmissible so long as Price does not assert that Curtis is unable to identify the location where she fell. However, if Price "opens the door," then Curtis will be allowed to impeach his testimony with proof that Price paved the area in and around the location of her accident.

(Order, entered October 5, 2018, R. at 376).

At trial, Curtis sought to question Gary Price on this subsequent remedial measure, contending Price had opened the door to this line of questioning by his testimony denying the existence of any dangerous conditions, "and that the property was as safe as it could be[.]" (Appellant's brief, p. 11). Curtis wanted to present evidence of the subsequent repairs to impeach that statement. The circuit court would not allow that line of questioning.

The jury returned a verdict for Price. This appeal followed. Other facts will be provided as necessary in the context of the analysis.

# ANALYSIS

Curtis argues the circuit court erred in two ways: (1) by excluding evidence of Price's subsequent repairs; and (2) by failing to give a missing evidence jury instruction. We are not persuaded by either argument.

We review a circuit court's evidentiary ruling for an abuse of discretion. *Benjamin v. Commonwealth*, 266 S.W.3d 775, 791 (Ky. 2008). Likewise, "[i]t is within the trial court's discretion to deny a requested instruction, and its decision will not be reversed absent an abuse of discretion." *Auslander Properties, LLC v. Nalley*, 558 S.W.3d 457, 469 (Ky. 2018) (citing *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

### *Subsequent Remedial Measures*

The admissibility of evidence of subsequent remedial measures is governed by KRE[4] 407. That Rule says:

> When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or

---

[4] Kentucky Rules of Evidence.

> instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or *feasibility of precautionary measures, if controverted, or impeachment.*

KRE 407 (emphasis added).

Curtis argues that the last two exceptions to KRE 407 apply. First, she contends Price controverted the feasibility of precautionary measures and that proof of subsequent remedial repairs should have been allowed to refute that testimony. As Curtis puts it, Gary Price said, "the property was as safe as it could possibly be." (Appellant's brief, p. 15).

Second, she characterizes Price's testimony as refuting that he knew, or that anyone could know, where Curtis fell. She argues that proof of subsequent repairs, had it been allowed, would have impeached his credibility by showing he knew where to repair the ground that caused her fall.

The record shows that, after cautiously and thoughtfully considering these issues, the circuit court disagreed with Curtis's interpretations of Gary Price's testimony. To understand the rulings, we need to put Price's testimony into context. We focus first on Curtis's claim that Price controverted the feasibility of making safer the place where Curtis fell.

Curtis's first witness was her father, Jessie. He testified that, before the movie started, and while it was still light, he went to the concession stand. He

could not say it was the same path his daughter took, but he testified generally that the way to and from the concession stand was "rough" and that was "just the way it is." (Jessie Curtis testimony: Video Record (V.R.) 10/17/18; 4:23:10-4:24:20). He examined two contemporaneous photos (Plaintiff's Exhibits 1 and 2) and said they showed the general area where his daughter fell. (*Id.*). He added that there was "broken pavement" in the area. (V.R. 10/17/18; 4:38:10-4:38:50).

Curtis then called Gary Price as her second witness to testify on her behalf. Among other questions, Curtis asked whether five photos Price had taken shortly after the incident (Plaintiff's Exhibits 3 through 7) accurately depicted the condition of the ground where Curtis fell. He was hesitant to swear that the photos depicted the specific location of Curtis's fall. Out of hearing of the jury, the circuit court characterized Price's reticence as "non-responsive" and "evasive" on that question.[5] However, the circuit court had already ruled in a pre-trial order, without objection, that all seven photographs "depict where the parking lot transitions '*from asphalt to gravel.*'" (R. at 373). It was unrefuted that Curtis fell along this transition.

---

[5] At least twice, the circuit court found it necessary during direct examination to instruct Price to answer only the question asked. (*See*, *e.g.*, V.R. 10/18/18; 8:55:07-8:56:14). On cross-examination he was able to clarify that he had been at the concession stand preparing for intermission when he heard of the accident, grabbed a bag of ice, went briefly to the scene, saw that a nurse who happened to be at the drive-in was caring for Curtis, and realized he needed to be at the exit gate to allow an ambulance to enter. (V.R. 10/18/18; 9:28:25-9:29:02).

Curtis argues that Price's testimony on direct examination was a denial of the feasibility of making the premises safer. She points to the following testimony: "[I] try to be as safe as possible. . . . We try every way we can, to again, make it safe. . . . I spend nights, evenings, weekends, days making sure that place is as safe as I possibly can . . . . I try to make things as safe as possible." (Appellant's brief, p. 11 (citing to the Video Record)).

When Curtis finished direct examination, she turned her witness over to Price's counsel for cross-examination. Cross-examination lasted about fifteen minutes, beginning with some general questions about the business. Inexplicably, the circuit court cautioned defense counsel about leading the witness,[6] and the questions became largely open-ended.

Price said on cross-examination that Curtis's accident occurred just a few minutes before intermission. This was consistent with Curtis's subsequent testimony. Price said, "We try to be as safe as possible. At intermission we have flood lights go up . . . . We turn on the concession lights. We try every way we can, again, to make it safe." (V.R. 10/18/18; 9:27:52-9:28:10).

---

[6] Apparently forgetting that Curtis called Price as her own witness and conducted a direct examination, the court, *sua sponte*, stated, "Let me caution you about leading your own witness." Just as inexplicably, counsel acquiesced, stating, "I will. Sorry, your honor." (V.R. 10/18/18; 9:26:26-9:26:30). If there was an order or agreement of the parties for Price's counsel to examine Price during Curtis's case-in-chief only as if on direct examination, it was not brought to the attention of this Court.

-8-

Curtis argues the foregoing testimony satisfied KRE 407's non-feasibility controversy exception. We agree with the circuit court that it did not. For this exception to apply, the premises liability defendant must clearly refute or, to use the language of the rule, controvert the feasibility of making the premises safer. Price did not do that.

In fact, it was through Gary Price's testimony that Curtis first presented evidence that, despite his safety efforts, the ground surface where asphalt meets gravel might have become disturbed. (V.R. 10/18/18; 9:07:50-9:07:59). This was consistent with his deposition testimony that, "unfortunately, our lot is not – not perfect in any way shape or form. . . . It's definitely not smooth. I would never testify to that." (Gary Price Depo., pp. 18-19). To the extent Curtis believed Price's trial testimony contradicted what he said previously, she could have impeached him with this deposition testimony, but she did not.

Price did not refute the only evidence that preceded his testimony – that of Curtis's father – that the surface of the lot was rough. Curtis had not established a controversy through Price's testimony regarding the feasibility of improving the lot's surface condition. "Pursuant to the plain language of the rule, in the absence of controversy, the feasibility exception of KRE 407 simply does not apply." *Davis v. Fischer Single Family Homes, Ltd.*, 231 S.W.3d 767, 775 (Ky. App. 2007).

Curtis's second argument for getting around KRE 407's prohibition of evidence of subsequent remedial measures was to impeach Gary Price's testimony "that it could not be known where [Curtis] fell, that his own photographs did not show the hazard on which she fell, and that his own photographs were inaccurate and not reliable." (Appellant's brief, p. 7). The circuit court appears not to have interpreted Price's testimony in that way. From our examination of the record, we agree and see no abuse of discretion in the circuit court's ruling.

Contrary to Curtis's argument, Price's testimony about the photos did not demonstrate his intent to prove the site of Curtis's fall could not be identified. He said nothing more than that he was not certain as to the specific location, but that the photos depicted the general area of the fall. His trial testimony was consistent with his deposition testimony in describing the photos that, "to my knowledge, that's pretty close to the general area" where Curtis fell. (Gary Price Depo., p. 12). Again, this prior testimony was not used to impeach Price.

When cross-examined by his own counsel, Price testified unequivocally that his photos showed "a broader view of the general area where [he] believed Miss Curtis fell that night." (V.R. 10/18/18; 9:32:10-9:32:17). When Price's counsel attempted to clarify Price's testimony regarding whether the photos showed the "specific" location of the fall, the circuit court again admonished counsel for asking leading questions:

Counsel: Is it correct you did not take those pictures specifically because that's where Miss Curtis fell?

Court: Mr. Smith, I'm going to admonish you again. You're leading the witness.

Counsel: Just a little leeway, Judge?

Court: Not much, this is your witness, and this is direct examination.

Counsel: Alright.

(V.R. 10/18/18; 9:33:27-9:33:43). The record is clear that Gary Price had been called as Curtis's witness, that Curtis conducted direct examination of Price, and that Price's counsel was cross-examining Price when the admonitions were given. We do not understand why the admonition was given when "leading questions should be permitted on cross-examination . . . ." KRE 611(c). Despite this hindrance, counsel elicited testimony from Price that, taken as a whole, indicates he had taken photos he believed showed the general area of Curtis's fall, but he could not be certain of the specific location.

When Price's counsel finished cross-examining Price, Curtis's counsel asked for a bench conference and said, "I think he opened the door judge, clearly." Counsel pointed particularly to Price's testimony about being uncertain where Curtis fell. Curtis's counsel cited the exceptions to KRE 407 as allowing evidence of subsequent remedial measures to impeach a party's testimony, and to

-11-

refute a party's denial that further safety precautions were unfeasible. The court convened a bench conference to discuss the issues out of the jurors' hearing. (V.R. 10/18/18; 9:37:47-10:04:49).

The initial focus of the sidebar conference was Price's testimony regarding the photos he had taken depicting the asphalt-to-gravel transition. The circuit court viewed Price's testimony as, "at times, non-responsive and evasive, but as best I could follow it was that he wasn't there and so he is not sure where it is that she fell." (V.R. 10/18/18; 9:42:34-9:42:44). The court continued:

> My greater concern with respect to his testimony is that he has repeatedly testified and volunteered, even when not asked, is that this was the safest it could be . . . .
>
> [Evidence of] subsequent remedial measures can come in for impeachment purposes to impeach that testimony that there wasn't anything else [Price] could do to make the premises any more safe.

(V.R. 10/18/18; 9:43:19-9:43:30).

Price's unsolicited testimony concerned the circuit judge, who had admonished Price to answer only questions asked of him. Although the court said it was "not sure [Price] hasn't cracked the door at this time[,]" it overruled Curtis's motion to allow evidence of subsequent remedial measures, but reserved the right to reconsider the ruling after more testimony. (V.R. 10/18/18; 9:48:43-9:50:35). Then, when asked by Price's counsel how to avoid opening the door to a KRE 407 exception, the circuit court said:

-12-

> [T]he short answer is this: we've got skilled and competent attorneys on both sides of this case and as long as [Price] answers the questions that are asked of him that door will not open. If he continues to volunteer and ad lib and embellish on the questions that are asked of him, he's gonna open that door without even realizing that he's done it. There hasn't been a question asked of him today that ultimately would have opened that door . . . .

(V.R. 10/18/18; 9:51:37-9:52:16). Wrapping up, the circuit court reiterated that if Price responded only to the questions asked, "ultimately that door will remain safely closed." (V.R. 10/18/18; 9:52:38-9:52:42).

Price spent about eight more minutes on the witness stand and he responded concisely to the questions. His testimony in Curtis's case-in-chief concluded. Curtis then took the stand and examined the two photos her father had examined and the five photos Price examined. She then testified that they accurately depicted the condition of the ground where she fell. (V.R. 10/18/18; 1:11:37-1:13:10). The issue of subsequent remedial measures did not come up again during the trial.

Guarding against a loose application of KRE 407 and its exceptions is necessary to avoid the danger Professor Lawson warned against – that "the general rule against the use of [subsequent remedial measures] will be swallowed if plaintiffs are permitted to use [the impeachment] exception as a mere pretext for using the evidence to establish culpability." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.50[3][d] (2019 ed.) (quotations omitted). Having

-13-

carefully examined the record and thoroughly considered counsels' arguments, we conclude that the circuit court did not abuse its discretion by disallowing evidence of subsequent remedial measures.

### *Missing Evidence Instruction*

Curtis next asserts she was entitled to a missing evidence instruction to remedy Price's spoliation of evidence, *i.e.*, his intentional destruction of evidence by paving over the general area where Curtis fell. We find no abuse of discretion in the circuit court's disallowance of a missing evidence instruction.

The latest word on missing evidence instructions came just a few months ago, in *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696 (Ky. 2020), where the Supreme Court said:

> While we acknowledge that parties in civil litigation must not destroy evidence the parties know is relevant to potential litigation, we do not agree . . . that a party is always entitled to a missing-evidence instruction, to uphold "judicial integrity," in all cases where evidence is not available after the party responsible for the evidence was put on notice of potential litigation.

*Id.* at 733 (footnote omitted).

Relying, in large part, on *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783 (Ky. 2011), the Supreme Court further stated:

> [T]he trial court is within its discretion to give a missing-evidence instruction when: (1) the evidence is material or relevant to an issue in the case; (2) the opponent had "absolute care, custody, and control over the evidence;"

-14-

(3) the opponent was on notice that the evidence was relevant at the time he failed to produce or destroyed it; and (4) the opponent, "utterly without explanation," in fact failed to produce the disputed evidence when so requested or ordered. In so finding, we [noted] . . . that "nonproduction alone 'is sufficient by itself to support an adverse inference even if no other evidence for the inference exists[.]'"

*Disselkamp*, 600 S.W.3d at 731 (footnotes omitted).

"In fact," said the Supreme Court, "the *Beglin* court explicitly declined to adopt 'a special rule for measuring the quantum or quality of evidence that will authorize a missing evidence instruction.' [*Beglin*, 375 S.W.3d] at 790. Instead, the *Beglin* court opted for a flexible standard that grants wide discretion to the trial court." *Id.* at 730 n.112. We keep these flexible standards in mind as we assess whether the circuit court abused this wide discretion in denying the missing evidence instruction.

The first shortcoming we see in Curtis's argument for a missing evidence instruction is that Price was not put on notice to preserve the drive-in grounds as they were the night of Curtis's fall. The spoliation letter addresses only "the video footage involved in this incident" and asks that it be preserved and made "available for our expert to inspect." (R. at 116). Nothing is said about the drive-in grounds themselves.

Secondly, Curtis testified that the seven photos accurately depicted the location and condition of the site where she fell. Some of those photos were taken

by Curtis's representative, indicating she had access to the premises before the ground maintenance that occurred more than a month after her fall. Obviously, proof of the condition of the ground where Curtis fell was obtainable, and obtained, before maintenance occurred. There is no suggestion that Curtis intended a site visit by the jury. Certainly, Curtis did not intend to bring that patch of asphalt and gravel to the courtroom. We see no abuse of discretion in the decision of a circuit court to decline a missing evidence instruction when there is no suggestion that the party seeking it intended ever to introduce that evidence.

Third, "there is absolutely no evidence that this evidence was unavailable due to anything other than negligence or normal purging procedures." *Id.* at 735. Here, Price was engaging in normal maintenance procedures. Gary Price was asked in deposition why, when he learned he had ordered more asphalt than he needed, he instructed some of the excess to be placed in the general area where Curtis fell; he said, "I just felt like if it had been an issue with Ms. Curtis, that it would be better to put it in that area than it would be in some other area." (Gary Price Depo., p. 14).

A missing evidence instruction must be predicated upon proof of spoliation. "'Spoliation' is a label for evidence of litigant misconduct that is probative enough to satisfy the relevance requirement of KRE 401 and 402." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.70[3][a] (2019 ed.).

"[A] party's destruction of evidence is admissible as spoliation evidence . . . but only upon showings that the destroying party acted deliberately and with knowledge of the evidence's importance." *Id*. Curtis presented no such evidence.

Accordingly, we conclude the circuit court did not abuse its wide discretion when it declined to instruct the jury on missing evidence.

## **CONCLUSION**

Based on the foregoing, we affirm the Simpson Circuit Court's trial order and final judgment entered October 30, 2018.

ALL CONCUR.

BRIEF FOR APPELLANT:

Kelli Lester
Adrian Mendiondo
Bowling Green, Kentucky

BRIEF FOR APPELLEE:

Aaron D. Smith
David W. Anderson
Bowling Green, Kentucky