C. Dale GOODIN, M.D. and Central
Kentucky Medical Group,
P.S.C., Appellants,

v.

Allison B. WHITE and Bluegrass
Family Health, Inc.,
Appellees.

No. 2009–CA–002261–MR.

Court of Appeals of Kentucky.

April 15, 2011.

Todd D. Willard, Lexington, KY, Gerald R. Toner, Brent T. Asseff, Louisville, KY, for appellants.

David L. Helmers, Lexington, KY, C. David Ewing, David Klapheke, Louisville, KY, for appellees.

Before LAMBERT and STUMBO, Judges; SHAKE,[1] Senior Judge.

*OPINION*

SHAKE, Senior Judge:

Dr. Dale Goodin and the Central Kentucky Medical Group, P.S.C. (collectively referred to as Goodin) appeal from a Woodford Circuit Court Judgment, entered on September 29, 2009, and an Order, entered on November 19, 2009, denying Goodin's motion for a new trial. Goodin claims that he was denied a fair trial based upon what Goodin characterizes as a *Mary Carter* agreement between Allison White (White) and Bluegrass Family Health, Inc. (Bluegrass). After carefully reviewing the briefs, the record, ·

---

1. Senior Judge Ann O'Malley Shake sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

and applicable law, we affirm the Circuit Court Judgment and Order.

White is a former patient of Goodin. On May 17, 2005, White sought treatment from Goodin and complained of abdominal pain and nausea. Suspecting appendicitis or problems associated with her gallbladder, Goodin ordered that White undergo a CT scan and an ultrasound of her abdomen. On the following day, White had an ultrasound. White's health insurance provider, Bluegrass, denied coverage for the CT scan, which was not therefore done.

On May 19, 2005, White returned to Goodin's office and complained of worsening symptoms and severe pain. He misdiagnosed the pain as musculoskeletal and applied a pain patch. When her pain did not subside, White contacted Goodin's office on May 23, 2005. At that time, Goodin ordered an x-ray, rather than a CT scan.

On May 25, 2005, Goodin's office wrote a letter to Bluegrass appealing its denial of coverage for the CT scan. The CT scan was finally approved and was performed on June 9, 2005. The scan revealed that White's appendix had ruptured. An emergency appendectomy and ileocolectomy were performed. As a result of these procedures, White lost her appendix and a portion of her intestine and colon. Additional surgeries followed the initial emergency procedure. White's medical bills totaled $109,259.05. In addition, White is likely to require future medical treatment due to the appendix rupture.

On May 11, 2006, White filed suit in the Woodford Circuit Court against Goodin. White claimed that Goodin was negligent and deviated from the standard of care in his treatment of her condition. Goodin filed a third-party complaint against Blue-

grass based upon his contractual relationship with the insurer[2]. Goodin claimed that Bluegrass wrongfully denied coverage for the CT scan. Goodin alleged that he was entitled to indemnity from Bluegrass for any judgment against him.

Shortly before trial, White and Bluegrass reached a settlement agreement which was reduced to writing and signed after the trial had begun.

The redacted agreement provided in part:

1.1. In consideration of the following agreements, White hereby releases and discharges Bluegrass from any and all claims, demands, obligations, actions, causes of action, rights, damages, costs, losses of services, expense and compensation of any nature whatsoever, whether based on a contract, tort, or other theory of recovery, which White may have on account of which may in any way arise out of the allegations as set forth in the pleadings filed by the parties in this matter.

. . . .

2.0 Bluegrass agrees to pay White up to a maximum of ____. As consideration for this agreement, White agrees that Bluegrass shall receive a lien against any damages that the jury awards against Dr. Goodin attributable to his actions or omissions up to a maximum of ____. As further consideration for this agreement, the parties agree that Bluegrass retains a legal interest in this case and will participate at trial. As further consideration for this agreement, White agrees to indemnify and hold harmless Bluegrass for any claim of indemnity or contribution by Dr. Goodin which would result in payment by Bluegrass over and

2. Goodin entered into a contractual relationship with Bluegrass, whereby the insurance company paid Goodin for services that he performed for patients covered under their insurance coverage and Goodin was listed by the company as a "preferred provider."

above _____. Accordingly, under this agreement Bluegrass will not pay more than _____ for any and all claims arising out of this litigation, and will not pay White less than _____ depending upon the application of the lien described above if any.

. . . .

6.0 As further consideration for this settlement, White and Bluegrass and her attorneys agree to keep this Release and Settlement Agreement strictly confidential and will not disclose the amount or terms of the settlement to any person, company or agency other than the parties' immediate family, legal counsel, insurers, accountants or other financial advisors as necessary or if ordered to do so by a court of competent jurisdiction or as required by law. This is a material term of the Release and Settlement Agreement.

Prior to trial, the court and Goodin were informed that White and Bluegrass had reached a settlement agreement. The redacted agreement, however, was not provided to the court and Goodin until after jury selection when the terms of the written agreement were acknowledged on the record. Goodin moved to admit the settlement agreement as evidence of bias. The trial court denied Goodin's motion, ruling that, if evidence of bias occurred, Goodin could renew his motion. The trial court clearly stated, "If something comes up during cross-examination that indicates there's some bias, then you might want to come up and readdress the issue."

After four days of testimony, the jury returned a verdict in favor of White and awarded her $1,359,259.05. The jury found that Goodin was 100% at fault. Judgment in favor of White was entered on September 29, 2009.

Based upon the settlement agreement and its non-disclosure to the jury, Goodin moved the court to set aside the judgment and requested a new trial. He argued that the agreement was an unfair *Mary Carter* agreement that created bias. The Woodford Circuit Court disagreed. This appeal follows.

### A. *Mary Carter* Agreements

■ The term "*Mary Carter* agreement" derives from a 1967 case from Florida, *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla.Ct.App.1967), *rejected by Ward v. Ochoa*, 284 So.2d 385, 388 (Fla. 1973), and *abrogated by Dosdourian v. Carsten*, 624 So.2d 241 (Fla.1993), which upheld the validity and nondisclosure of an agreement that limited the liability of two out of three defendants. In a classic *Mary Carter* agreement: (1) the settling defendant's liability is limited although that defendant remains a party at trial; (2) the agreement is not disclosed to the non-settling parties and/or judge and jury; and (3) it guarantees to the plaintiff a minimum recovery, even though the plaintiff may not recover a judgment against the agreeing defendant or that the verdict may be less than that specified in the agreement. *Slusher v. Ospital by Ospital*, 777 P.2d 437, 440 (Utah 1989).

Although courts generally agree about the basic elements of *Mary Carter* agreements, jurisdictions differ in their treatment of the agreements. The Supreme Court of Utah upheld *Mary Carter* agreements, provided that the terms of the agreement are disclosed to the jury. *Id.* at 441–442. In *Slusher, id.*, the Court stated:

> defendant tort-feasors enter into a settlement agreement, the parties must promptly inform the court and the other parties to the action of the existence of the agreement and of its terms. Where the action is tried by a jury, the court shall, upon motion of a party, disclose

the existence and basic content of the agreement to the jury *unless* the court finds that, on facts particular to the case, such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

*Slusher v. Ospital by Ospital,* 777 P.2d 437, 444 (Utah 1989).

In 1993, the Florida Supreme Court banned Mary Carter agreements all together. The Court reasoned:

In addition, Mary Carter agreements, by their very nature, promote unethical practices by Florida attorneys. If a case goes to trial, the judge and jury are clearly presuming that the plaintiff and the settling defendant are adversaries and that the plaintiff is truly seeking a judgment for money damages against both defendants. In order to skillfully and successfully carry out the objectives of the Mary Carter agreement, the lawyer for the settling parties must necessarily make misrepresentations to the court and to the jury in order to maintain the charade of an adversarial relationship.

. . . .

[w]e are convinced that the only effective way to eliminate the sinister influence of Mary Carter agreements is to outlaw their use. We include within our prohibition any agreement which requires the settling defendant to remain in the litigation, regardless of whether there is a specified financial incentive to do so.

*Dosdourian v. Carsten,* 624 So.2d 241, 244 & 246 (Fla.1993).

The Supreme Court of Texas described this rationale in *Elbaor v. Smith,* 845 S.W.2d 240 (Tex.1992). "No persuasive public policy justifies them, and they are not legitimized simply because this practice may continue in the absence of these agreements. The *Mary Carter* agreement is simply an unwise and champertous device that has failed to achieve its intended purpose." *Id.* at 249.

Although *Mary Carter* agreements have garnered national attention over the past forty years as a means of settlement, Kentucky Courts have yet to confront this issue. Certainly the agreement in this case shares many characteristics of a *Mary Carter* agreement. The agreement limited the liability of Bluegrass and required Bluegrass to participate in trial. The agreement guaranteed that White would recover a minimum amount from Bluegrass, even though the jury may render a judgment against Goodin. Further, the nature of the agreement was not disclosed to Goodin or the court until trial was underway and was never disclosed to the jury. The agreement, however, was disclosed to the court and to Goodin once its terms were reduced to writing.

However, what distinguishes this case from typical *Mary Carter* scenarios is that Bluegrass's continued presence at trial was not only because of the settlement agreement but also because Goodin never moved to dismiss its third party action against Bluegrass.

### B. Non–Disclosure to the Jury

 The trial court declined to admit the agreement into evidence absent proof of bias or prior inconsistent statements. Goodin claims that non-disclosure of the agreement to the jury resulted in a fundamentally unfair trial. The court's ruling on this issue was well grounded. As a means to encourage settlements, Kentucky law generally disfavors the admission of settlement agreements into evidence. *See Green River Elec. Corp. v. Nantz,* 894 S.W.2d 643, 646 (Ky.App.1995). Completed settlement agreements are no more

admissible than offers made during the negotiation process. *Id.*

■ As in this case, however, Kentucky courts generally allow the admission of settlement agreements for purposes of impeachment concerning prior inconsistent statements and bias. *Miller ex rel. Monticello Baking Co. v. Marymount Med. Ctr.*, 125 S.W.3d 274, 281–82 (Ky.2004). "'Any proof that tends to expose a motivation to slant testimony one way or another satisfies the requirement of relevancy. The range of possibilities is unlimited....'" *Id.* at 281, *citing to* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 4.15, at 183 (3d ed.1993).

■ Certainly, the alliance of a plaintiff and settling defendant could create biased testimony and trial strategy. In those situations, the jury, as the finders of fact, must be informed of potential bias in order to make an informed opinion concerning witness credibility.

> The interest of a witness, either friendly or unfriendly, in the prosecution or in a party is not collateral and may always be proved to enable the jury to estimate credibility. It may be proved by the witness' own testimony upon cross-examination or by independent evidence.

*Miller ex rel. Monticello Baking Co.*, 125 S.W.3d at 282 (Citations omitted).

The record does not indicate that White or any of White's witnesses changed their testimonies or made inconsistent statements after the settlement agreement was executed. Further, Goodin did not preserve his assertions of bias when the proof was coming in by moving the court to reconsider its earlier ruling. In addition, no avowal testimony was taken.

Goodin argues that bias was evidenced in White's trial strategy. Specifically, Goodin claims that White was harsher during pre-trial depositions to witnesses favorable to Bluegrass than White was at trial. However, White was under no obligation to maintain the same strategy or to vigorously examine any witness. With or without a settlement agreement, White had no reason to practice the case in a manner that would benefit Goodin. The jury was fully informed that White had settled with Bluegrass. The jury knew that White was no longer adverse to Bluegrass and that White remained completely adverse to Goodin. Moreover, Goodin's attorney had wide latitude throughout the trial to hammer that point home to the jurors.

Bluegrass's participation does not indicate bias or an unfair alliance. Aside from the terms of the agreement that required the Bluegrass's continued participation at trial, Goodin filed a contractual indemnity claim against Bluegrass. Dr. Goodin could have dismissed this claim but declined to do so.

Because the jury had been informed that White and Bluegrass had settled, the jury was well aware that White and Bluegrass were not adversarial parties but that Bluegrass and Goodin were adversaries and that Goodin and White were adversaries. The agreement's disclosure would not have altered that well-known reality in any way.

Therefore, the trial court's denial of White's motion to admit the settlement agreement did not result in unfairness and was not erroneous.

### B. Preemptory Strikes

■ Goodin also claims that White and Bluegrass's failure to inform the trial court of the nature of the settlement agreement resulted in White and Bluegrass receiving additional preemptory strikes than they otherwise would have had. Kentucky Rules of Civil Procedure (CR) 47.03(1) pro-

vides, "In civil cases each opposing side shall have three peremptory challenges, but co-parties having antagonistic interests shall have three peremptory challenges each."

 Whether co-parties have antagonistic interests is determined by examining three elements: (1) Whether the co-parties are charged with separate acts of negligence; (2) Whether the co-parties share a common case theory; and (3) Whether cross-claims have been filed. *Sommerkamp v. Linton,* 114 S.W.3d 811, 815 (Ky.2003). In addition, courts may consider whether the co-parties share counsel, whether the alleged negligence occurred together or at separate times, whether the co-parties share the same defenses, and whether fault will be subject to apportionment. *Id.* These elements and factors must be weighed by the court to determine if the co-parties have antagonistic interests and are, thus, entitled to separate peremptory challenges. *Id.*

Goodin argues that the number of preemptory strikes allocated to each party may have been different if the terms of the agreement had been disclosed prior to jury selection. The record indicates that although White and Bluegrass had discussed a probable settlement, the settlement was not reduced to writing until jury selection was complete. Therefore, at the time of jury selection there was no written agreement to disclose.

Moreover, White and Bluegrass's interests were not aligned, nor were they co-parties. Significantly, Goodin's indemnity claim proceeded against Bluegrass.

Based upon the foregoing reasons, the trial court's denial of Goodin's motion for a new trial based upon the Bluegrass preemptory strikes was not erroneous.

Accordingly, the Woodford Circuit Court Judgment and subsequent Order denying Goodin's motion for a new trial is affirmed.

ALL CONCUR.