RENDERED: SEPTEMBER 25, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-0724-MR

DEWANE BEASEY                                APPELLANT

|  | APPEAL FROM JEFFERSON CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE DARRYL LAVERY, JUDGE |
|  | ACTION NO. 16-CI-001184 |

FORD MOTOR COMPANY; ABEL
CONSTRUCTION COMPANY, INC.;
AND ESIS, ON BEHALF OF ALLIED
BARTON SECURITY SERVICES, LLC               APPELLEES

AND                    NO. 2018-CA-0824-MR

ABEL CONSTRUCTION COMPANY, INC.         CROSS-APPELLANT

|  | CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT |
| --- | --- |
| v. | HONORABLE DARRYL LAVERY, JUDGE |
|  | ACTION NO. 16-CI-001184 |

DEWANE BEASEY; FORD MOTOR

COMPANY; AND ESIS, ON BEHALF
OF ALLIED BARTON SECURITY
SERVICES, LLC                                          CROSS-APPELLEES


AND                          NO. 2019-CA-0105-MR


DEWANE BEASEY                                          APPELLANT


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE ANNIE O'CONNELL, JUDGE
                         ACTION NO. 16-CI-001184


FORD MOTOR COMPANY; ABEL
CONSTRUCTION COMPANY, INC.;
AND ESIS, ON BEHALF OF ALLIED
BARTON SECURITY SERVICES, LLC                         APPELLEES


                              OPINION
                             AFFIRMING

                          ** ** ** ** **

BEFORE:  ACREE, CALDWELL, AND LAMBERT, JUDGES.

CALDWELL, JUDGE:  While working as a fire and security officer, Dewane

Beasey injured himself by stepping into a water-filled hole at a construction site at

the Ford Motor Company (Ford) plant in Louisville in 2016.  Beasey sued, among

others, Ford and Abel Construction Company, Inc. (Abel), who was helping

-2-

construct an addition to Ford's facility. A jury ruled in favor of Ford but found Abel 60% at fault on a negligence *per se* claim alleging a breach of the Kentucky Building Code (the Code), assigning the other 40% of fault to Beasey. The trial court then, unusually, issued two judgments. Though there are stylistic differences between them, the main substantive difference, for purposes of these appeals, is that the first judgment stated that Beasey was entitled to interest but the second made no mention of interest. Beasey appealed, listing both judgments; Abel cross-appealed, listing only the second judgment. Appeal Nos. 2018-CA-0724-MR and 2018-CA-0824-MR.

Beasey asserted Abel's cross-appeal was untimely. Therefore, Abel successfully asked us to stay the already-pending appeals while it sought relief under Kentucky Rule of Civil Procedure (CR) 60.02 in the trial court to clear up which judgment controlled. The trial court's ruling did not address CR 60.02, but instead held the second judgment was intended to supersede the first and the lack of language indicating that intent in the second judgment was a clerical error subject to correction at any time under CR 60.01. Beasey then filed appeal No. 2019-CA-0105-MR, asserting the trial court's order was improper. We elect to resolve all three related appeals in this opinion.

-3-

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

Procedurally, these three appeals are reminiscent of a civil procedure final exam in their complexity. The underlying facts which gave rise to Beasey's suit are simpler, however.

In January 2016, Beasey, a fire and security officer for Allied Barton Security Services (Allied), responded to a call about a burst or leaking pipe at the Ford plant. Beasey tried to locate the riser to drain the pipe. In so doing, he stepped into the construction site. Plastic sheeting and/or a plywood barricade erected by Abel to, ostensibly, prevent entry to the construction site had been removed or pushed aside. Beasey saw water on the floor near a column but thought it was only a puddle. Unfortunately, the water filled a roughly three-feet-deep hole. Beasey stepped into the hole and injured his knee and shoulder.

Beasey then filed the underlying action, alleging ordinary negligence against Abel for failing to warn/properly barricade the construction site and negligence *per se* for failing to insulate properly the burst pipe, as allegedly required by the Code via adoption of a national set of standards, the National Fire Protection Agency Standards (the NFPA). Beasey also alleged Ford was negligent for failing to maintain the aging pipe.

The matter progressed to a lengthy trial held in March 2018. The jury found against Beasey on all ordinary negligence claims. However, on the

negligence *per se* claim, the jury found that Abel had failed to meet its duties under the Code and that failure was a substantial factor in Beasey's injuries, assigning 60% of the fault to Abel and 40% to Beasey. The jury awarded Beasey a total of $314,253.53 in damages, $250,000.00 of which was for pain and suffering and $64,253.53 of which was for past medical expenses.

On April 2, 2018, Beasey's counsel e-filed a proposed judgment which contained photocopies of the verdict forms completed by the jury and an additional page stating that Beasey was entitled to recover $188,552.11 from Abel (a forty-percent reduction from the jury's verdict due to its finding Beasey forty-percent at fault), which "shall accrue interest at the rate of SIX PERCENT (6%) compounded annually . . . ." Apparently, counsel did not circulate the proposed judgment amongst opposing counsel before tendering it. The next day, the trial court issued a short order requiring Beasey to file within ten days "a proposed judgment consistent with the jury's verdict. Prior to filing, Plaintiff shall provide a copy to counsel for each Defendant for each to sign off and approve as to form only."[1]

Counsel for the various defendants were not satisfied with Beasey's proposed judgment because, *inter alia*, it failed to address the trial court's directed verdict rulings. On April 11, counsel for Ford circulated a proposed judgment. No

---

[1] The judge signed that order on April 2, but it was not filed until April 3.

party, however, alerted the court to any objection it had to Beasey's proposed judgment. Thus, the court signed Beasey's tendered judgment, and that signed judgment was entered by the clerk of court on April 12, 2018 (hereafter the "first judgment.").[2] Abel contends it did not timely receive copies of the first judgment.

On April 18, 2018, counsel for Ford tendered another judgment. That judgment did not say that it amended, superseded, or supplemented the extant judgment. Indeed, it did not mention the first judgment, nor did it mention any entitlement by Beasey to interest. It did, however, contain a statement that all counsel, including counsel for Beasey, agreed for it to be entered. Despite the existence of the first judgment, and even though the second judgment did not comply with the court's order because it was not tendered by Plaintiff's counsel or within the ten-day deadline for submitting proposed judgments, the circuit judge signed the second tendered judgment (hereafter the "second judgment") on April 20, 2018, and it was entered by the clerk of court on April 23, 2018.[3]

On May 10, 2018, Beasey filed a notice of appeal stating that he was appealing from both the first and second judgments. On May 30, 2018, Abel filed its notice of cross-appeal, stating that it was appealing from the second judgment.

---

[2] Curiously, the trial judge signed the judgment on April 3, but it was not entered for nine days. The reason for that unusually lengthy gap is not apparent from the face of the record.

[3] April 20, 2018, was a Friday; April 23, 2018, was the following Monday.

-6-

The date of Abel's cross-appeal is important because CR 74.01(1) provides in relevant part that a cross-appeal must be filed "not later than 10 days after the last day allowed for the filing of a notice of appeal."  A party has thirty days after the judgment to file a notice of appeal under CR 73.02(1), so Beasey's appeal from the first judgment would have been due May 14, 2018,[4] meaning Abel's cross-appeal from the first judgment would have been due ten days later (May 24, 2018).  In short, Abel's May 30, 2018 cross-appeal is timely if the appellate window is calculated from the entry of the second judgment but untimely if calculated from the entry of the first judgment.

Given Beasey's position that Abel's cross-appeal was untimely, in October 2018, Abel filed a motion to vacate the first judgment pursuant to CR 60.02 or, in the alternative, to vacate that order under CR 60.01, which generally permits correction of clerical mistakes at any time.  Ford argued the motion should be granted; Beasey, unsurprisingly, opposed it.  In November 2018, we granted Abel's motion to abate these appeals to permit the trial court to rule on Abel's

---

[4] Thirty days from April 12, 2018, was May 12, but that was a Saturday so Beasey had until the following Monday—May 14—to file the notice of appeal via application of CR 6.01, which provides in relevant part:

> In computing any period of time . . . the day of the act . . . after which the designated period of time begins to run is not to be included.  The last day of the period so computed is to be included, unless it is a Saturday, a Sunday or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday or a legal holiday.

.

then-pending CR 60.02 motion. Our order did not mention the request for alternative relief under CR 60.01.

In December 2018, the trial court granted Beasey's motion.[5] The trial court held that a court has ten days to amend a judgment on its own initiative under CR 59.04, and so the second judgment was timely.[6] The trial court held it was "clear that it was the intention of the Court for the April 23, 2018, Order and Judgment to amend and vacate the previous Order and be controlling in this case." The trial court also held that CR 60.01 applied because "[t]he fact that the second order did not state 'Amended Order and Judgment' is a clerical error that the Court now corrects." *Id.* Finally, the trial court noted that only the second judgment had been approved by all parties' counsel. Oddly, the trial court did not address CR 60.02. Dissatisfied, Beasey appealed that ruling. Appeal No. 2019-CA-0105-MR.

---

[5] Circuit Judge Annie O'Connell granted the motion to vacate; Circuit Judge Darryl Lavery conducted the trial and signed the two judgments.

[6] Ten days after the first judgment was April 22, 2018, which was a Sunday. The second judgment was entered the next day, Monday, April 23, 2018. As the parties have not cited authority to the contrary, we assume arguendo that CR 6.01 applied to deem the second judgment having been entered within ten days of the first. Regardless, as will be discussed later, CR 59.04 expressly applies to a court *sua sponte* ordering a new trial and thus is inapplicable here.

# ANALYSIS[7]

## Abel's Cross-Appeal Was Timely Filed

Because it impacts whether Abel's cross-appeal is timely, we must begin by addressing the most recent appeal—Beasey's appeal from the trial court's order granting post-judgment relief under CR 59.04/60.01.

## CR 59.04 Is Inapplicable

Adding to an already thorny procedural thicket, the trial court curiously relied upon CR 59.04 in its post-judgment order. CR 59.04 provides:

> Not later than 10 days after entry of judgment the court
> of its own initiative may order a new trial for any reason
> for which it might have granted a new trial on motion of
> a party. After giving the parties notice and an
> opportunity to be heard on the matter, the court may
> grant a motion for a new trial, timely served, for a reason
> not stated in the motion. In either case, the court shall
> specify in the order the grounds therefor.

Obviously, the trial court's post-trial order construing the second judgment as having superseded the first was issued well more than ten days after the entry of both previous judgments, and the trial court did not mandate a new trial in the

---

[7] The plethora of briefs submitted by the parties totals roughly 140 pages. We have carefully read them but, to avoid making an already lengthy opinion truly unwieldy, we will discuss only the matters we deem necessary to resolve properly these appeals.

second judgment (nor has it ever so held).  Consequently, we agree with Beasey

that the trial court's reliance upon CR 59.04 was erroneous.[8]

### The Trial Court Did Not Err by Using CR 60.01 to Clarify that the Second Judgment Amended the First

The trial court also relied upon CR 60.01 in its post-judgment order.

That rule provides:

> Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.  During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

We stayed the first two appeals to permit the trial court to rule on

Abel's post-judgment CR 60.02 motion, but the trial court ignored CR 60.02 in its

order.  Nonetheless, we will not elevate rigid form over practical function and will

---

[8] Perhaps the trial court meant to cite to CR 59.05, which provides that "[a] motion to alter or amend a judgment, or to vacate a judgment and enter a new one, shall be served not later than 10 days after entry of the final judgment."  However, when tendering the second judgment, no party explicitly moved to alter, amend, or vacate the first.  Ford and/or Abel have contended that tendering the second judgment "had the same effect" and thus "should be construed as" a CR 59.05 motion.  Record (R.) at 2559.  But we need not resolve that interesting argument since we conclude the trial court properly relied upon CR 60.01.  Similarly, our conclusion that CR 60.01 was properly applied renders moot Abel's alternate argument that its post-judgment motion could have been granted under CR 60.02.

leniently construe our stay order as being sufficiently broad to permit the trial court to decide the matter under CR 60.01.

Our substantive analysis begins with the fundamental fact that "[t]here can be only one judgment or one final judicial determination upon a single cause of action . . . ." 46 AM. JUR. 2D *Judgments* § 9 (2020). Therefore, either the first or second judgment must control—both cannot do so simultaneously.

Generally, "[a] judge, having rendered and signed one final judgment, has no authority to sign another one" so "the entry of a second final judgment in the same cause does not vacate the first, and if there is nothing to show that the first is vacated, then the second is a nullity." *Id.* *Accord* 49 C.J.S. *Judgments* §107 (2020) ("In the absence of a statute to the contrary it is a general rule that there can be only one final judgment in any action . . . [thus] [i]t follows as a necessary consequence of the general rule that, when a final judgment has once been entered, no second or different judgment may be rendered between the same parties and in the same suit, until the first has been vacated and set aside or reversed on appeal or error. Where a second judgment is entered by a court after the first judgment has become final the second judgment is void.") (footnotes omitted). Application of that general rule would lead to a preliminary conclusion that the second judgment here was void. However, as with many general rules, there are exceptions. Most pertinent here is an exception by which a second judgment issued when a court

-11-

retains "plenary power" over the action (*i.e.*, during the period when the court retains jurisdiction) "is treated as a modified or reformed judgment that implicitly vacates and supercedes [sic] the prior judgment, unless the record indicates a contrary intent." *Price Construction, Inc. v. Castillo*, 147 S.W.3d 431, 441 (Tex. App. 2004).

That general rule and the exception thereto align roughly with CR 52.02, which provides in relevant part that "[n]ot later than 10 days after entry of judgment the court of its own initiative, or on the motion of a party made not later than 10 days after entry of judgment, may amend its findings or make additional findings and may amend the judgment accordingly." In other words, a trial court may modify its judgments within ten days after their entry; it may not do so after that ten-day period expires. Thus, a second judgment issued after the trial court lost jurisdiction would be void. *See, e.g.*, *Harris v. Camp Taylor Fire Protection Dist.*, 303 S.W.3d 479, 482 (Ky. App. 2009) (explaining that a judgment becomes final after ten days and, thus, a trial court loses jurisdiction ten days after its final judgment is entered). But a second judgment issued within that ten-day period must logically have been intended to supersede, or at least amend, the first judgment. After all, there would be no reason for a trial court to issue a second judgment if it did not intend to impact an extant judgment.

Here, the second judgment was issued (via application of CR 60.01) ten days after the first judgment and, thus, was issued while the trial court retained jurisdiction. Of course, better practice would have been for the second judgment to have explicitly stated how it related to the first. But the regrettable lack of such information is not dispositive. Instead, the second judgment's silence as to its relationship with the first means this case falls squarely within the presumption that a second judgment issued while a court retains jurisdiction implicitly supersedes the first judgment *sub silentio*. *Price Construction, Inc.*, 147 S.W.3d at 441.

That conclusion could be rebutted upon a showing of contrary intent. But the parties have not made that showing. In fact, since all parties agreed to the second judgment, but not the first, and the trial court expressly ordered the parties to submit a judgment upon which all parties had agreed, it logically follows that the trial court intended the second judgment to control. Indeed, that is exactly what the court held when it granted relief under CR 60.01.

Speaking thereof, we agree with the trial court that amending the second judgment to merely state that it was an amended judgment was a permissible correction of a clerical error. Based upon the sheer number of cases in which the appellate courts of this Commonwealth have been tasked with determining whether an error is clerical or judicial, it is an understatement to say

-13-

the answer to that ever-vexing question is not always "readily apparent." *Machniak v. Commonwealth*, 351 S.W.3d 648, 653 (Ky. 2011). The potential for confusion is heightened by the fact that, despite the name, even a judge may commit a "clerical error." *Javier Steel Corp. v. Central Bridge Co. LLC*, 353 S.W.3d 356, 359 (Ky. App. 2011). Despite the difficulty in doing so, properly categorizing an error is crucial because only a clerical error may be corrected at any time under CR 60.01. *See Wides v. Wides*, 300 Ky. 344, 188 S.W.2d 471, 473 (1945) (explaining that "unlike clerical errors, judicial errors cannot be corrected at any time, but must be done seasonably, in accordance with statutory or code provisions for the correction of erroneous judgments").

"[T]he distinction between clerical error and judicial error does not turn on whether the correction of the error results in a substantive change in the judgment." *Cardwell v. Commonwealth*, 12 S.W.3d 672, 674 (Ky. 2000). Instead, for nearly a century Kentucky has based the distinction on whether the error "was the deliberate result of judicial reasoning and determination, regardless of whether it was made by the clerk, by counsel, or by the judge." *Buchanan v. West Kentucky Coal Co.*, 218 Ky. 259, 291 S.W. 32, 35 (1927) (quotation marks and citation omitted).

Clerical errors cannot be mistakes "of substance, of judgment, or of law[,]" but instead generally are "inadvertences or oversights . . . apparent on the

-14-

face of the document or record in which they appear, and are, therefore, discoverable by inspection." *Id.* at 35-36 (internal quotation marks and citation omitted). Thus, errors which are plainly clerical include "an incorrect or missing date on a document in the record; a mistake made when transcribing numbers; or a mathematical error when calculating a judgment . . . ." *Machniak*, 351 S.W.3d at 652 (citations omitted).

Here, Beasey appears to misconstrue what the error actually is. The error is not that the second judgment did not mention interest. Indeed, the failure to include interest in a judgment may, or may not, be a clerical error. *Whittenberg Engineering & Const. Co. v. Liberty Mut. Ins. Co.*, 390 S.W.2d 877, 884 (Ky. 1965) ("It is our view that where failure to include interest is a clerical error it is correctible under CR 60.01, but where no clerical error is shown, and certainly none is shown here, then relief may be had only under the provisions of CR 59 or CR 60.02 or by appeal."). Instead, as the trial court aptly noted, the error manifest from the face of the second judgment is the lack of a notation as to how it relates to the first judgment.

We are unpersuaded that the failure to include the word "amended" in the caption of the second judgment was a reasoned, deliberate decision by the trial court. Given the incontrovertible principle that there may be only one final judgment in a case, it is difficult to fathom that a judge would intentionally issue

two judgments without providing any guidance as to their relationship. Thus, the lack of an indication in the caption as to whether the second judgment superseded the first, such as by adding one word, "amended," must logically be deemed an oversight, easily perceptible from viewing the record.

As the trial court noted in its order granting CR 60.01 relief, the court intended the parties to all agree to (at least as to the form of) a judgment; only the second judgment contained such agreement. Thus, we agree with the trial court that the court intended for the second, agreed judgment to control over the first, to which only Beasey agreed.[9] That conclusion also fits within the previously discussed principle that a second judgment issued within the narrow window in which a trial court retains jurisdiction of a case implicitly supersedes any extant judgments. In short, we affirm the trial court's decision to correct a clerical error in the second judgment to add the word "amended" in the caption thereof, meaning that the second judgment is the operative judgment. That conclusion, in turn,

---

[9] Beasey's attorneys stated in affidavits that they agreed to the second judgment with the expectation that it would only supplement the first judgment, and that they believed the omission of interest in the second judgment was unintentional. We are unsure as to the basis of those beliefs. Based upon email discussions amongst counsel, it is uncontested that only Beasey's counsel agreed to the first judgment and there is nothing concrete to show that interest was somehow unintentionally omitted from the second judgment. If Beasey's counsel believed Beasey to be entitled to interest, counsel should have raised the omission of interest in the second judgment before agreeing to it instead of relying upon a curious, idiosyncratic interpretation of it.

-16-

means Abel's cross-appeal was timely filed.[10]  As will be seen later, however, that does not mean Abel is entitled to relief.

**Beasey's First Appeal, No. 2018-CA-0724-MR**[11]

**There Was Not a "Mary Carter" Agreement**

Beasey contends Ford and Abel entered into a secret "Mary Carter" agreement prior to trial which they failed to disclose to the trial court until each had received three peremptory challenges.  *See* CR 47.03(1) ("In civil cases each opposing side shall have three peremptory challenges, but co-parties having antagonistic interests shall have three peremptory challenges each.").  Actually, the agreement was a routine contractual indemnification agreement, not an improper "Mary Carter" agreement.

Ford's position on indemnification was known well before the trial. Ford filed a motion for summary judgment in June 2017 arguing, in part, that it was contractually entitled to indemnification from Abel.  The indemnification portion of the contract between Ford and Abel was attached as an exhibit to Ford's motion for summary judgment, and provided in relevant part:

---

[10] A prevailing party typically is entitled to post-judgment interest under Kentucky Revised Statute (KRS) 360.040, unless there are unusual factors which make interest "inequitable." *Strunk v. Lawson*, 447 S.W.3d 641, 650 (Ky. App. 2013).  The second judgment contains no mention of interest and we express no opinion on whether Beasey is entitled to interest or, if so, the amount, or rate, thereof.

[11] Beasey offers to forego the issues presented in his first appeal if we deem Abel's cross-appeal untimely.  But since we conclude the cross-appeal is timely, we must address the issues.

> [Abel] will indemnify [Ford] . . . for all expenses . . .
> incurred by [Ford] in connection with all claims
> (including lawsuits . . . and other proceedings to recover
> for personal injury or death . . .) that are related in any
> way to [Abel's] . . . performance or obligations . . . .
> [Abel's] obligation to indemnify under this Section will
> apply regardless of whether the claim arises in tort,
> negligence, contract, warranty, strict liability or
> otherwise except to the extent of the negligence of
> [Ford].
>
>  . . . .
>
> [Abel] shall be exclusively responsible for, shall bear,
> and shall relieve [Ford] from liability for all loss,
> expense, damage or claims resulting from bodily injury
> . . . sustained by any person or persons . . . arising out of,
> or in connection with the performance of work on
> [Ford's] premises except that [Abel] shall not be
> responsible for or relieve [Ford] from liability for claims
> arising from the willful misconduct or the sole
> negligence of [Ford].

The trial court denied Ford's summary judgment motion in August 2017, many months prior to trial.

On the first day of the trial, the trial court asked the defendants if their interests were antagonistic, and Abel's counsel generally responded in the affirmative. No one objected or stated a contrary position. Thus, the trial court granted Abel and Ford three peremptory challenges each.

During a conference the court conducted with counsel outside the jury's presence later during the trial, Beasey's counsel asked whether Abel had agreed to indemnify Ford because Beasey's counsel wanted to use that agreement

to show bias by Ford's risk manager, who had allegedly changed his opinion as to who/what caused Beasey's injuries. Abel's counsel stated that Abel's insurance carrier had agreed to indemnify Ford pursuant to the contract. After discussion, the trial court directed the parties to brief the indemnification/bias issues.

A few days later, the trial court asked counsel why they had not mentioned the indemnification agreement when asked if Ford and Abel had antagonistic interests. Abel's counsel responded that Abel and Ford were not entirely aligned, as exemplified by Ford blaming Abel for not adequately insulating the pipe that froze and burst. The trial court ruled that Beasey could not mention the indemnification agreement to the jury, stating that the alleged bias was too tenuous, and inadmissible under Kentucky Rule of Evidence (KRE) 403 as its probative value was outweighed by its prejudicial effect.

We begin by disagreeing with Beasey that the indemnification agreement was a "Mary Carter" agreement. A "Mary Carter" agreement, so named because of a notorious case from Florida,[12] is defined in relevant part as:

> A contract, usu. secret, by which one or more, but not all, codefendants settle with the plaintiff and obtain a release, along with a provision granting them a portion of any recovery from the nonparticipating codefendants. • In a Mary Carter agreement, the participating codefendants agree to remain parties to the lawsuit and, if no recovery is awarded against the nonparticipating codefendants, to

---

[12] *Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla. Dist. Ct. App. 1967), *abrogated by Dosdourian v. Carsten*, 624 So.2d 241 (Fla. 1993).

pay the plaintiff a settled amount.

BLACK'S LAW DICTIONARY (11th ed. 2019). Here, Abel's insurance carrier agreed to indemnify Ford. That agreement did not involve Beasey, nor did either Abel or Ford agree to pay Beasey a sum certain, regardless of the jury's verdict. Thus, there was no "Mary Carter" agreement.

Having made that important distinction, we must now determine whether the trial court erred by refusing to permit the jury to learn of the indemnification agreement. We deferentially review a trial court's evidentiary decisions for abuse of discretion. *See*, *e.g.*, *Barnett v. Commonwealth*, 317 S.W.3d 49, 61 (Ky. 2010).

At its core, the indemnification agreement is a type of settlement agreement. Settlement agreements are generally inadmissible in Kentucky. *Goodin v. White*, 342 S.W.3d 282, 286 (Ky. App. 2011). However, settlement agreements may be admissible "for purposes of impeachment concerning prior inconsistent statements and bias[,]" *id.* at 287, because "'[a]ny proof that tends to expose a motivation to slant testimony one way or another satisfies the requirement of relevancy.'" *Miller ex rel. Monticello Banking Co. v. Marymount Medical Center*, 125 S.W.3d 274, 281-82 (Ky. 2004) (quoting Robert G. Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK § 4.15, at 183 (3d ed. 1993)).

That rubric aligns with KRE 411, which provides that "[e]vidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully" but is admissible to show, among other things, "bias or prejudice of a witness." But even if an agreement is relevant, "[t]here is always the danger that a jury will show less sympathy to an insured defendant, inappropriately resulting in a verdict for the plaintiff." *Woolum v. Hillman*, 329 S.W.3d 283, 287 (Ky. 2010). Therefore, a court must determine whether the agreement's probative value is substantially outweighed by the danger of undue prejudice under KRE 403. *Id.* In making that admissibility determination, a trial court is vested with "broad discretion to evaluate the proof of bias on a case-by-case basis." *Id.* at 289 (citing *Wallace v. Leedhanachoke*, 949 S.W.2d 624, 628 (Ky. App. 1996)). However, "dual concerns—the general inclusionary thrust of the Rules of Evidence and the more particular preference to allow evidence of bias—weigh heavily in favor of admissibility" of evidence of bias, though there may be "unusual circumstances wherein the evidence would be either extremely prejudicial or minimally probative . . . ." *Baker v. Kammerer*, 187 S.W.3d 292, 296 (Ky. 2006).

The main thrust of Beasey's bias claim is that a risk manager for Ford, Danny Huffman, changed his theory of who was responsible for Beasey's injuries

after Ford and Abel reached their indemnification agreement. However, Beasey offers nothing concrete to support his self-serving conjecture.

A report made by, or approved by, Huffman shortly after the accident indicated a "root cause" of the injuries was Abel "not hav[ing] adequate barriers and lighting used to identify and block access to the excavation/hole where [Beasey] fell." Huffman apparently continued to believe the lack of barriers/lighting was a root cause of the accident at his February 2017 deposition. However, at a later deposition,[13] and at trial, Huffman no longer believed those to be root causes of Beasey's injuries. Huffman testified that he did not believe the investigation which preceded the initial report was thorough and had gained additional information from "educating" himself.

There is nothing inherently nefarious about a witness having an opinion which evolves over time due to additional familiarity with the subject at issue. Moreover, Beasey has not contradicted Ford's assertion that the indemnification agreement was not reached until *after* Huffman's "trial" deposition occurred. Logically, therefore, Huffman cannot have changed his mind based

---

[13] Huffman was unavailable for a previously-scheduled trial date, so his trial deposition was taken in September 2017. Later, the trial was continued and so he testified live. Beasey has not cited exactly where in the voluminous record, which is nearly 2700 pages long, we may find a transcript of Beasey's "trial" deposition. We again remind the parties that it is their affirmative duty to cite to exactly where we may find matters in the record because we shall not sift through the record to try to find them. However, since no party seems to disagree, we will assume solely for the sake of argument that Huffman's testimony at his trial deposition was similar to his trial testimony.

upon a then-nonexistent agreement.  Indeed, Huffman's avowal testimony at trial indicated that he did not even know what "assumption of defense" meant.  In short, Beasey only has a subjective theory, not grounded upon any tangible evidence, that Huffman changed his testimony about causation as a reaction to Abel's insurance carrier indemnifying Ford.

As the trial court aptly noted, the allegations of bias here are *extremely* attenuated.  Therefore, we cannot find that the court abused its discretion by refusing to permit Beasey to present testimony about the indemnification agreement because "absent a more compelling degree of connection[,]" there is not "clearly evince[d]" bias by Huffman and thus the "arguable relevance or probative value" of the indemnification agreement "is insufficient to outweigh the well-established rule as to the inadmissibility of evidence as to the existence of insurance." *Wallace*, 949 S.W.2d at 628.

By contrast, our Supreme Court approved admitting testimony that an expert doctor shared an insurance carrier with a defendant doctor in a wrongful death action because of overwhelming evidence that the expert doctor "was biased by their commonality of insurance because he believed that a judgment against his insurance company could adversely affect his own premiums[,]" which the Court deemed to demonstrate a "strong connection between common insurance and witness bias . . . ." *Woolum*, 329 S.W.3d at 287, 290.  The conjectural bias offered

by Beasey falls well short of being "strong" and is much more akin to the facts of *Wallace*.[14]

### No Error in Allowing Additional Peremptory Challenges

Somewhat related to his argument regarding the indemnification agreement, Beasey contends the trial court erred by granting Ford and Abel three peremptory strikes apiece since the indemnification agreement caused their interests to not be antagonistic. We disagree.

Before we examine the merits of Beasey's claim, we note that Abel and Ford have not provided a satisfactory explanation of why they failed to tell the trial court about the indemnification agreement prior to trial or, at the latest, when the court asked if their interests were antagonistic. Nearly seventy years ago Kentucky's then-highest court reminded the bar that, as an officer of the court, "an attorney owes the duty of good faith and honorable dealing to the courts before whom he practices . . . ." *Lewis v. Rice*, 261 S.W.2d 804, 805 (Ky. 1953). We are disappointed counsel did not timely, fully, and voluntarily divulge the relationship between their clients to the court. The trial court was entitled to know the full picture before having to allocate peremptory challenges.

---

[14] It is unclear what tangible relief Beasey would like us to afford him, even if we agreed with his position on the indemnification agreement. In his brief, Beasey asks us to issue a "strong reprimand" to the trial court. Beasey's brief in No. 2018-CA-0724-MR at 17. But even a "strong" reprimand would have no practical effect as it would not impact Beasey's damage award nor would it result in a new trial. Thus, a reprimand would be a toothless tiger, "full of sound and fury, [s]ignifying nothing." William Shakespeare, *Macbeth*, Act 5, Scene 5.

CR 47.03(1) provides that "[i]n civil cases each opposing side shall have three peremptory challenges, but co-parties having antagonistic interests shall have three peremptory challenges each." The question is whether Abel and Ford had antagonistic interests. Of course, the trial court unfortunately had to make that determination before the indemnification agreement was brought to light. Indeed, trial judges always must make that determination before the proof is presented and so we must view the question as it existed when the court made its decision, not based upon the perfect acuity only afforded by omniscient hindsight. *Davis v. Fischer Single Family Homes, Ltd.*, 231 S.W.3d 767, 774 (Ky. App. 2007). Our review of a trial court's decision is deferential, so "if the findings of fact are not clearly erroneous or the opposite result is not compelled by the facts before the trial court, the decision of the trial court will not be disturbed, even if we would have come to a different conclusion." *Id.* at 773.[15]

---

[15] Some cases state that we review an "antagonistic interests" decision under an abuse of discretion standard. *See, e.g.*, *Sommerkamp v. Linton*, 114 S.W.3d 811, 814-15 (Ky. 2003) ("The Court of Appeals should not substitute its judgment for that of the trial judge in determining whether antagonistic interests exist for the purpose of awarding peremptory challenges in the absence of an abuse of discretion."). Usage of that standard of review is curious since our Supreme Court held more than forty years ago, albeit in a case pre-dating the adoption of CR 47.03, that "the allocation of peremptory challenges in civil cases has occupied a settled role as part of the trial process in this jurisdiction from 1830 to the present day. *It is a defined mechanism and does not depend on the exercise of judicial discretion*." *Kentucky Farm Bureau Mut. Ins. Co. v. Cook*, 590 S.W.2d 875, 877 (Ky. 1979) (emphasis added).

However, if the issue has been properly preserved, a party does not have to show prejudice to obtain appellate relief from an improper allocation of peremptory challenges. *Kentucky Farm Bureau Mut. Ins. Co.*, 590 S.W.2d at 877. Here, the issue is not preserved because Beasey did not object contemporaneously when the trial court afforded Abel and Ford additional peremptory challenges.[16] The issue under these facts, therefore, is whether the trial court's decision warrants relief under CR 61.02, which provides that a "palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." An error is palpable if it is "so egregious that it jumps off the page . . . and cries out for relief[,]" *Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012) (internal quotation marks and citation omitted), and is so elemental as to be "easily perceptible, plain, obvious and . . . so serious that it would seriously affect the

---

[16] It is difficult to know how much Beasey's counsel knew of the indemnification agreement when the peremptory challenge allocation occurred. In its brief, Ford accuses Beasey's counsel of "[e]xpressing feigned surprise and outrage about the contractual indemnity provision of which he had been long aware" but also states, seemingly contradictorily, that "it never occurred to anyone to advise Beasey's counsel when Abel or its liability insurer finally agreed to" enforce the contractual indemnity provision. Ford's brief in No. 2018-CA-0724-MR at 8, 12. Regardless, Beasey did not contemporaneously object or press opposing counsel for information about indemnification when the trial court asked if Ford and Abel had antagonistic interests, so the issue was not properly preserved. Even if Beasey had preserved the issue, however, we would still affirm the trial court.

fairness to a party if left uncorrected." *Hibdon v. Hibdon*, 247 S.W.3d 915, 918

(Ky. App. 2007) (internal quotation marks and citation omitted).

> To determine if parties have antagonistic interests courts consider:
>
> 1) whether the coparties are charged with separate acts of negligence; 2) whether they share a common theory of the case; and 3) whether they have filed cross-claims. Additional important factors are whether the defendants are represented by separate counsel; whether the alleged acts of negligence occurred at different times; whether the defendants have individual theories of defense; and whether fault will be subject to apportionment.

*Sommerkamp*, 114 S.W.3d at 815 (citations omitted). A court should not "give

disqualifying weight to a single factor . . . ." *Id.* at 816.

Abel and Ford did not file cross-claims. However, they were:

represented by separate counsel, charged with discrete acts of negligence, did not

entirely share the same theory of the case, and were subject to apportionment of

fault. Moreover, a plain reading of the indemnification clause shows that Abel was

not required to indemnify Ford if Ford's sole negligence led to the injuries. Under

the instructions given here, a jury could theoretically have found Ford alone was

negligent. In short, though Abel's and Ford's financial interests did align to a

degree, we find no error, palpable or otherwise, in the trial court's decision to grant

them additional peremptory challenges under CR 47.03(1).[17]

---

[17] Beasey also contends the trial court erred by instructing the jury that they could apportion fault to Allied. The jury ultimately apportioned no fault to Allied, and Beasey states the argument is

-27-

**Abel's Cross-Appeal, No. 2018-CA-0824-MR**

Abel contends the trial court erred, for various reasons, by denying its motion for summary judgment and for directed verdict. Before we may address those arguments on the merits, however, we must address Abel's brief's lack of compliance with the requirements of CR 76.12.

CR 76.12(4)(c)(i) provides that an appellant's brief should contain an introduction "not exceeding two simple sentences" but Abel's introduction contains four paragraphs and is over a page long. CR 76.12(4)(c)(iv) requires an appellant's statement of the case to contain "ample references to the specific pages of the record, or tape and digital counter number in the case of untranscribed videotape or audiotape recordings," but Abel's brief cites infrequently and insufficiently to the written record and cites mainly to Beasey's deposition testimony, not trial testimony. Similarly, CR 76.12(4)(c)(v) requires an appellant's argument section to provide "ample supportive references to the record . . . ."

As we explained over three decades ago, "depositions not read into evidence at a jury trial . . . should not be included in the record on appeal." *Lucas v. Lucas*, 720 S.W.2d 352, 353 (Ky. App. 1986). Abel does not show where Beasey's deposition was read into evidence at the trial. Perhaps this deficiency in

_____

premised upon the matter being retried. Because we are not ordering a retrial, the issue is moot, and we decline to address it.

-28-

Abel's brief is best highlighted by the fact that Abel argues vehemently that the trial court erred in denying its motion for summary judgment but fails to specify where we may find its motion in the nearly 2,700-page record. Again, "[i]t is not the job of the appellate courts to scour the record in support of an appellant or cross-appellant's argument." *Dennis v. Fulkerson*, 343 S.W.3d 633, 637 (Ky. App. 2011). Simply put, Abel's brief contains insufficient citations to the record.[18]

Perhaps most egregiously, Abel fails to state in its argument section where, or how, it preserved any of its sundry claims of error for our review, despite CR 76.12(4)(c)(v) requiring a statement "at the beginning of the argument" as to "whether the issue was properly preserved for review and, if so, in what manner." This omission is critical because the nature of our review depends on whether an issue has been preserved. Specifically, as previously discussed, we generally may review unpreserved claims of error only for a palpable error under CR 61.02, but even then, we typically only do so upon request. *See, e.g., Webster v. Commonwealth*, 438 S.W.3d 321, 325 (Ky. 2014).

---

[18] Specifically, Abel's statement of the case is over five pages long but contains only about three citations to the written record and about three citations to the trial (not pretrial depositions); the argument section of Abel's brief is roughly sixteen pages long but contains approximately only seven citations to the trial testimony, four of which are in the same sentence. Abel's brief in No. 2018-CA-0824-MR at 21. In fact, Abel begins its argument section on page seven of its brief, but it does not cite to *any* trial testimony until page fourteen. Glaringly, Abel's roughly five-page argument that the trial court erred by overruling its motion for summary judgment contains a couple of citations to Beasey's deposition but *no* other citations to the trial. Finally, Abel's argument section provides us with little to no citations to the written record.

Abel did not ask for palpable error relief, instead contending its issues were adequately preserved. To show preservation, Abel relies upon a few citations in the statement of the case section of its brief (not the argument section, as required by CR 76.12) where it alleges it preserved its issues. But those citations do not show preservation of all issues.

Abel raises three overarching issues. First, it contends the trial court erred in denying its motion for summary judgment but does not cite to where its motion may be found in the record, nor does that section of its brief adequately cite otherwise to relevant portions of the record.

Regardless, the argument is not properly reviewable. "The general rule under CR 56.03 is that a denial of a motion for summary judgment is, first, not appealable because of its interlocutory nature and, second, is not reviewable on appeal from a final judgment where the question is whether there exists a genuine issue of material fact." *Transp. Cabinet, Bureau of Highways, Commonwealth of Ky. v. Leneave*, 751 S.W.2d 36, 37 (Ky. App. 1988). There is a limited exception, commonly known as the *Gumm* exception, which permits appellate review when "(1) the facts are not in dispute, (2) the only basis of the ruling is a matter of law, (3) there is a denial of the motion, and (4) there is an entry of a final judgment with an appeal therefrom. Then, and only then, is the motion for summary judgment properly reviewable on appeal . . . ." *Id.* (citing *Gumm v. Combs*, 302 S.W.2d 616

(Ky. 1957)). Here, as Beasey accurately notes, the trial court expressly held that there were genuine issues of fact in the order denying summary judgment. R. at 1050. Therefore, the *Gumm* exception is inapplicable. *Recbar, LLC v. Drake*, 579 S.W.3d 198, 201 (Ky. App. 2019). Consequently, we decline to address further Abel's summary judgment-based arguments.

Abel's second main argument is that the trial court erred by denying its motion for directed verdict on Beasey's negligence *per se* claim, for three main reasons. First, Abel contends Beasey was not within the class of persons intended to be protected by the NFPA. *See*, *e.g.*, *Alderman v. Bradley*, 957 S.W.2d 264, 267 (Ky. App. 1997) (explaining that negligence *per se* is "the violation of a statute, ordinance, or administrative regulation" but that "[i]n order for a violation to become negligence *per se,* the plaintiff must be a member of the class of persons intended to be protected by the regulation, and the injury suffered must be an event which the regulation was designed to prevent"). Second, Abel argues it could not be found liable for negligence *per se* for not meeting requirements of the NFPA which were not adopted by Kentucky. Third, Abel argues the alleged violation of the NFPA was not a substantial factor in causing Beasey's injuries.

Under the familiar standard, a directed verdict is proper only if "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ" even while drawing "all fair and

reasonable inferences from the evidence in favor of the party opposing the motion." *Argotte v. Harrington*, 521 S.W.3d 550, 554 (Ky. 2017) (internal quotation marks and citations omitted). Thus, a party inherently raises an insufficiency of the evidence argument when it claims entitlement to a directed verdict.[19]

Abel has cited to where it moved for a directed verdict at the close of Beasey's case-in-chief based upon an argument that Beasey was not within the class of persons encompassed within the protection of the Code. Abel also cites to what it believes to be where it argued for a directed verdict at the close of Beasey's proof due to Kentucky not having adopted the portion of the NFPA which Beasey relies upon for his negligence *per se* claim.[20] However, the cited portion of Abel's

---

[19] Abel also offers a one-sentence argument that the trial court erred by instructing the jury on negligence *per se*. Such an argument is conclusory and insufficiently developed to warrant discussion.

[20] 815 Kentucky Administrative Regulation (KAR) 7:120, §5(b) adopts the Kentucky Building Code by reference. Section 905.2 of the Code as it existed at the time of Beasey's injuries states that "[s]tandpipe systems required by this code shall be installed in accordance with this section and NFPA 14 *as referenced herein*."
http://dhbc.ky.gov/Documents/2013%20KBC%202nd%20Edition%20(February%202014)%20-%204.8.2014.pdf (emphasis added). But, as Abel's argument goes, the Code does not later "reference herein" NFPA 14, and so NFPA 14 was not adopted into the code which, in turn, means a violation of NFPA 14 may not constitute negligence *per se*. The current version of the Code remedies that situation by eliminating the "as referenced herein" language and instead simply stating in Section 905.2 that "[s]tandpipe systems shall be installed in accordance with this section and NFPA 14."
http://dhbc.ky.gov/Documents/Proposed%202018%20Kentucky%20Building%20Code%20Second%20Edition.pdf.
    Abel also points out that the version of Section 905.2.1 of the Code in effect when Beasey was injured provided that "[t]he riser piping, supply piping and the water service piping shall be hydraulically designed or pipe scheduled in accordance with NFPA 14 *as referenced in*

directed verdict argument does not actually contain such a discussion. Indeed, our review of Abel's motion for directed verdict did not reveal where it explicitly argued that Kentucky did not adopt the NFPA sections at issue. Crucially, Abel does not cite to where it moved for a directed verdict at the close of Beasey's proof, or at the close of all evidence, based upon its argument that any alleged failure to comply with NFPA was not a substantial factor in causing Beasey's injuries.

In sum, Abel has shown us where it argued at the close of Beasey's case he was not within the class of persons protected by the Code. Abel has not

---

*Chapter 35 of this code.*"
http://dhbc.ky.gov/Documents/2013%20KBC%202nd%20Edition%20(February%202014)%20-%204.8.2014.pdf (emphasis added). According to Abel, however, Chapter 35 of the Code, which may also be viewed using the link above and scrolling down further, did not reference the section(s) of NFPA 14 relied upon by Beasey. Although Abel's novel arguments are interesting, we do not need to definitively opine on them due to the fatal preservation issues discussed herein.

In any event, we would likely be disinclined to afford Abel relief on the merits. Courts interpret administrative regulations using the same fundamental tools and rubric used in interpreting statutes. *Commonwealth v. Estate of Cooper*, 585 S.W.3d 253, 257 (Ky. App. 2019). We generally interpret statutes—and, thus, administrative regulations—as written, affording the terms therein their normal meaning. *Gooch v. Commonwealth*, 496 S.W.3d 492, 495 (Ky. App. 2016). However, the paramount objective in interpreting statutes—and administrative regulations—is to carry out the intent of the General Assembly—or, here, the Housing Department. *Id.* We also will not interpret a statute literally if doing so would lead to an absurd or unreasonable result. *Id.* It is plain that the Housing Department intended to adopt NFPA 14. Abel's hyper-technical construction thwarts that obvious intent. It would be unreasonable and absurd to conclude the Housing Department failed to adopt *any* of the relevant portions of the NFPA when its clear intent was to the contrary, but that would be the practical impact of adopting Abel's arguments. Indeed, it is uncontested that Beasey offered expert testimony that the construction industry seems to believe the NFPA was applicable, drafting errors in the Code notwithstanding. Thus, Abel's argument—though superficially appealing— would likely fail on the merits.

-33-

shown where it raised the other arguments, nor has it shown where it renewed its

arguments at the close of all the evidence or moved for a JNOV.[21]

> Precedent clearly holds that a party:
>
> can only prevail on an insufficiency of the evidence
> claim if preserved through a motion for a JNOV, which
> in turn must be predicated on a directed verdict motion at
> the close of all the proof.  A mid-trial directed verdict
> motion alone, like the one made and relied on in part now
> by [Abel], is insufficient to preserve an insufficiency of
> the evidence claim . . . .  Failure to show preservation of
> claims prohibits this Court's review of those claims.

*Steel Techs., Inc. v. Congleton*, 234 S.W.3d 920, 926 (Ky. 2007), *abrogated on*

*other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012).  Therefore, Abel

has not shown where it fully preserved any of its three directed verdict issues for

our review.  As previously stated, we will not independently sift through this

colossal record to try to judicially triage Abel's deficient brief.

> As federal courts have colorfully held when encountering similar

situations, "[j]udges are not like pigs, hunting for truffles that might be buried in

the record."  *Emerson v. Novartis Pharmaceuticals Corp.*, 446 Fed. App'x 733,

736 (6th Cir. 2011) (internal quotation marks and citation omitted).  We also will

---

[21] Abel did not rectify the situation by providing a citation to where it renewed its directed
verdict motion at the close of proof in its reply brief.

not engage in palpable error review since Abel neither requested nor briefed it. In short, we affirm the trial court's denial of Abel's motion for directed verdict. [22]

## **CONCLUSION**

For the foregoing reasons, the Jefferson Circuit Court is affirmed in all three appeals resolved herein.

ALL CONCUR.

---

[22] Briefly, even if the claim had been properly preserved, we likely would have rejected Abel's argument that Beasey was not within the class of persons protected by the Code because the NFPA was explicitly designed only to protect for loss due to fire. The General Assembly stated in KRS 198B.050(3)(c) that the Code is expansively intended to "[p]rotect the public health, safety, and welfare within the state." KRS 198B.050(3)(c). Similarly, the Housing Department also took a broad view of the class of persons the Code was designed to protect. Section 101.3 of the Code, as it existed at the time of Beasey's injuries and as incorporated by reference at 815 KAR 7:120 §5, also sweepingly states that its provisions are designed to protect the public health, safety and general welfare. *See* http://dhbc.ky.gov/Documents/2013%20KBC%202nd%20Edition%20(February%202014)%20-%204.8.2014.pdf. The General Assembly's broad statement of intent controls over the apparently more cramped scope of the NFPA. Adoption of the NFPA, in whole or part, via the Code did not abrogate the broad scope of coverage expressed by the General Assembly and the Housing Department.

BRIEFS FOR APPELLANT/CROSS-APPELLEE DEWANE BEASEY:

James Bolus
Louisville, Kentucky

Robert C. Heuke, Jr.
Louisville, Kentucky

Kevin C. Burke
Jamie K. Neal
Louisville, Kentucky

BRIEFS FOR APPELLEE/CROSS-APPELLANT ABEL CONSTRUCTION COMPANY, INC.:

B. Scott Jones
Louisville, Kentucky

BRIEFS FOR APPELLEE FORD MOTOR COMPANY:

R. Thad Keal
A. Michelle Turner
Louisville, Kentucky

NO BRIEF FOR APPELLEE ESIS, ON BEHALF OF
ALLIED BARTON SECURITY SERVICES, LLC